**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **LONNIE RICHIE,** | ) |
| | ) |
| **Petitioner** | ) |
| | ) |
| **vs.** | )          **Case No. 98-CV-482-TCK-SAJ** |
| | ) |
| **MARTY SIRMONS, Warden,** | ) |
| **OKLAHOMA STATE PENITENTIARY,** | ) |
| | ) |
| **Respondent** | ) |

<u>**OPINION AND ORDER**</u>

This matter comes before the Court on remand from the Tenth Circuit Court of Appeals for further proceedings consistent with its July 25, 2005, opinion. <u>See</u> <u>Richie v. Mullin</u>, 417 F.3d 1117, 1125 (10th Cir. 2005). By Order entered April 27, 2004 (Dkt. # 55), this Court adopted and affirmed the Report and Recommendation of the Magistrate Judge (Dkt. # 52), conditionally granting Petitioner's petition for writ of habeas corpus. Respondent appealed (Dkt. # 56), and the Circuit Court reversed and remanded for further proceedings (Dkt. # 69). Accordingly, all remaining issues presented by death row inmate Lonnie Wright Richie, pursuant to 28 U.S.C. § 2254, are now before the Court.

Petitioner, who appears through counsel, challenges his murder conviction and death sentence in Tulsa County District Court Case No. CF-91-3676. <u>See</u> Dkt. # 6.  Respondent, Marty Sirmons, has filed a response to the Petition denying its allegations (Dkt. # 7). Petitioner has replied (Dkt. # 8). This Court has reviewed: (1) the Petition for Writ of Habeas Corpus; (2) the Response to the Petition filed by the State of Oklahoma; (3) the Reply to the Response filed by the Petitioner; (4) all supplemental materials, arguments and authorities filed by Petitioner, together with responses

1

by Respondent and replies by Petitioner; (5) transcripts of Preliminary Hearing proceedings (Volumes I - V); (6) transcripts of various pretrial hearings and proceedings held November 22, 1991, January 31, 1992, March 22, 1993, March 31, 1993, April 29, 1993, May 3, 1993, and September 20, 1993 (seven separate volumes); (7) transcript of the jury trial proceedings, Volumes I-III, held September 20-27, 1993; (8) all documents and exhibits admitted in jury trial proceedings, with the exception of State's ex. # 17 (handgun), and ex. # 27 (ammunition); (9) transcript of the sentencing proceedings held on October 18, 1993; (10) Original Record in Tulsa County Case No CF-91-3676, Volumes I - IV; (11) all other records before the Oklahoma Court of Criminal Appeals which were transmitted to this Court; and (12) the records and transcripts from the evidentiary hearing held before Magistrate Sam Joyner in this habeas corpus matter. The Court has also taken into account the opinion and mandate of the Tenth Circuit Court of Appeals in Richie, 417 F.3d at 1117.

For the reasons stated below, the Court finds that Petitioner is entitled to habeas corpus relief on his fifth ground. All other grounds for relief shall be denied.

## BACKGROUND

### I.    Factual history

On September 1, 1991, Tulsa police found the body of Mrs. Laura Launhardt in an abandoned house in rural Pawnee County. Petitioner and co-defendant Daniel Waller were charged with her murder, in addition to charges of kidnaping for extortion, robbery with a firearm and several counts of unauthorized use of a credit/debit card. The following evidence was presented during the guilt phase of Mr. Richie's trial.

On August 28, 1991, Mrs. Launhardt went to a K-Mart store in Tulsa, Oklahoma, to have

a prescription filled and do some shopping . On the same day several witnesses observed Mr. Richie

and Mr. Waller hanging around outside the K-Mart store. Later in the afternoon, Clyde Huffines,

an oilfield pumper, was checking leases near Mannford, Oklahoma, when he noticed three people

in the area near a van on one of the leases. One of the two men approached Huffines and stated that

they had "come up here to relieve ourselves." Huffines also noticed a woman standing in short

weeds approximately 35 feet from him. The woman came up to Huffines and said that he had

interrupted her from relieving herself and Huffines told her to "go ahead."  The woman then said

something to Huffines in a much softer voice which he was unable to understand.  She repeated the

statement, but Huffines was again unable to understand her.  The woman turned and walked away

from Huffines. Huffines subsequently identified the man he had spoken to as Mr. Richie, and the

woman as Mrs. Launhardt.

Richie, Waller and Mrs. Launhardt ended up at an abandoned, storm-damaged house near

Keystone Lake which was in close proximity to the above-mentioned oil lease. Once inside the

abandoned house, Mrs. Launhardt's wrists and ankles were bound and a long strap was tied around

her neck and attached to a clothes rod in a walk-in closet.  Richie and Waller left the abandoned

house in Mrs. Launhardt's van and proceeded to engage in a series of transactions utilizing the

victim's ATM card and other credit cards which had been stolen from her.

That evening, Mrs. Launhardt's husband reported her missing to the Tulsa Police. The officer

who took the initial missing person report was not helpful, so Mr. Launhardt began his own

investigation. Mr. Launhardt learned that his wife's debit and credit cards had been used, so he again

contacted the Tulsa Police. When Mr. Launhardt discovered that a Git-n-Go store in Muskogee,

Oklahoma, had a video tape of one of the ATM transactions, he contacted the Muskogee Police. The

Muskogee Police retrieved the tape. Mr. Launhardt reviewed it and saw two men on the tape using his wife's ATM card. The Tulsa Police then became more actively involved, and eventually arrested Daniel Waller at a motel in Muskogee. Waller led the police to the house in Pawnee County where Mrs. Launhardt's body was found. Richie was later apprehended in New Orleans, Louisiana, where Mrs. Launhardt's van was also found. At trial the prosecution argued that Mrs. Launhardt was deliberately killed by Richie because he lifted her by her feet causing her strangulation death from the strap around her neck. Richie's defense was that the victim was left alive in the abandoned house and died sometime later.

## II.     Procedural history[1]

Petitioner, Lonnie Richie, a/k/a Lonnie Wright Richie, was convicted following a jury trial in the District Court of Tulsa County, Oklahoma, Case No. CF-91-3676, of one count of kidnaping for extortion, one count of robbery with a firearm, one count of unauthorized use of a debit card, one count of larceny of an automobile, and one count of murder in the first degree (malice aforethought and felony murder).   At the conclusion of the sentencing stage of the trial, the jury found the existence of three aggravating circumstances: (1) continuing threat; (2) avoiding arrest or prosecution; and (3) murder was especially heinous, atrocious or cruel. The jury recommended a term of ninety-nine (99) years imprisonment for the kidnaping charge, sixty (60) years for the robbery with a firearm, twenty (20) years for the unauthorized use of a debit card, thirty (30) years for larceny of an automobile, and a death sentence as punishment for first degree murder. The trial court adopted the jury's recommendations and sentenced Petitioner accordingly on October 18, 1993. See S. Tr. at

---

[1] The original record will be cited "O.R." The trial transcript will be cited "T. Tr." The sentencing transcript will be cited "S. Tr." The evidentiary hearing transcript will be cited "Ev. Hr'g Tr."

2.

Petitioner filed a direct appeal of his conviction and sentence to the Oklahoma Court of

Criminal Appeals ("OCCA") in Case No. F-93-1095. Represented by attorney Cindy Brown,

Petitioner raised fifteen (15) propositions of error[2] on direct appeal:

Proposition I:    Mr. Richie was tried for murder in Tulsa County in derogation of his rights under Article II, Section 20, of the Oklahoma Constitution, which guarantees trial in the county in which the crime occurred, and in violation of his right to due process under the Fourteenth Amendment.

Proposition II:    The trial court erred in failing to instruct the jury that it was required to find the State had proven venue in Tulsa County by a preponderance of the evidence.

Proposition III:    Mr. Richie was denied a fair trial and due process of law under the Federal and State Constitutions because the information failed to sufficiently describe the first degree felony murder underlying felony of kidnaping, nor was the jury instructed on the crime charged; further the information did not adequately describe the charged crimes of kidnaping for extortion and robbery by firearm. This defect in the information deprived Mr. Richie of the ability to determine the nature of the charges against him and adequately defend himself in violation of State and Federal Constitutional due process principles.

Proposition IV:    The evidence was insufficient to sustain Mr. Richie's convictions for the charged crimes under Federal and State Constitutional principles.

Proposition V:    The trial court's failure to issue a second degree murder instruction violated Mr. Richie's Sixth, Eighth and Fourteenth Amendment rights to a fair jury trial under the United States Constitution and Article 22, §§ 7, 9 and 20 of the Oklahoma Constitution, and his right to be free from the arbitrary imposition of the death penalty.

Proposition VI:    The flight instruction given in this case violated Mr. Richie's fundamental presumption of innocence and denied him a fair and reliable trial, all in violation of the Fourteenth and Eighth Amendments to the United States Constitution and similar provisions

---

[2] Several of these propositions contain sub-propositions which are not set forth in detail here.

of the Oklahoma Constitution.

Proposition VII:   The trial court committed reversible error violating Appellant's Sixth Amendment right to confrontation and by not granting a new trial to Appellant when the State Medical Examiner made reference to the confession of the co-defendant during his testimony, thus improperly introducing a statement by a co-defendant inculpating Appellant.

Proposition VIII:   Prosecutorial misconduct in closing argument denied Appellant his constitutional right to a fair trial and to be free from the arbitrary imposition of the death penalty when references were made to double jeopardy and the jury's responsibility to convict and then emphasized once again even though an objection to the comments was sustained.

Proposition IX:   The trial court abused its discretion by failing to remove Loyal Penix for cause, a prospective juror who was predisposed to give the death penalty, thereby requiring the defense to exercise a peremptory challenge to remove this juror, which resulted in an objectionable juror sitting in judgment of Appellant, thus denying him a fair trial by an impartial jury in violation of the Sixth and Fourteenth Amendments and corresponding provisions of the Oklahoma Constitution.

Proposition X:   The trial court abused its discretion by failing to excuse prospective juror Billy Wooten for cause when she asked to be excused because her husband was a career law enforcement officer, and prospective juror Karen Hoefling, whose personal fears caused her to identify with the victim, both of whom volunteered they were concerned they would be biased against the defendant. Their continued presence on the jury required the defense to exercise two of its peremptory challenges to remove these jurors, which resulted in objectionable jurors sitting in judgment fo Appellant, thus denying him a fair trial by an impartial jury and freedom from the arbitrary imposition of the death penalty in violation of the Sixth, Eighth, and Fourteenth Amendments and corresponding provisions of the Oklahoma Constitution.

Proposition XI:   Admitting testimony from an unendorsed second stage witness for whom no prior adequate notice was given violated Appellant's rights under the Sixth, Eighth, and Fourteenth Amendments, under Article II, § 20 of the Oklahoma Constitution, and under Title 21 O.S. 1991, § 701.10.

Proposition XII:   Mr. Richie's death sentence must be vacated because it is based in part on a jury finding of Oklahoma's "continuing threat to society" aggravating circumstance, which is unconstitutionally vague and

6

overly broad on its face and as construed by this court in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Proposition XIII:  The trial court committed fundamental reversible error when it misinstructed the jury on the especially heinous, atrocious, or cruel aggravating circumstance.

Proposition XIV:  Mr. Richie's death sentence should be vacated because the State presented insufficient evidence to support the jury's finding of the aggravating circumstance that the murder was committed to avoid or prevent a lawful prosecution.

Proposition XV:  Errors in jury instructions given in the second stage of trial denied Appellant's rights under the Eighth and Fourteenth Amendments to due process and a reliable sentencing proceeding.

See Brief of Appellant, filed June 2, 1994, in OCCA Case No. F-93-1095.  The OCCA reversed the felony murder conviction, but affirmed the remainder of Petitioner's convictions and sentences. Richie v. Oklahoma, 908 P.2d 268, 275 (Okla. Crim. App. 1996) ("[T]he jury's finding of felony murder is invalid.").  The OCCA denied a rehearing on January 17, 1996. Id.

The Petitioner then sought certiorari review from the United States Supreme Court.  The request was denied on October 7, 1996.  Richie  v. Oklahoma, 519 U.S. 837 (1996 ).

Petitioner also sought post-conviction relief in OCCA Case No. PC-97-1556. Represented by attorney, Kristi L. Christopher,  Petitioner identified the following fifteen (15) propositions of error:

Proposition I:  Petitioner was deprived of effective trial counsel.

Proposition II:  Appellate counsel's failure to raise critical and meritorious issues on direct appeal violated Mr. Richie's right to the effective assistance of counsel.

Proposition III:  This court erred in upholding Mr. Richie's first-degree malice aforethought murder conviction in light of the fundamental errors created by the reversal of the felony-murder due to jurisdictional problems.

7

Proposition IV:     Mr. Richie was denied his right to due process to not stand trial when he was incompetent by the failure of the trial court to appoint an expert to assist the defense in determining Mr. Richie's competence, and trial counsel's ineffectiveness for failing to investigate and raise the issue of Mr. Richie's incompetency at trial especially considering that Mr. Richie is actually incompetent.

Proposition V:      Mr. Richie's due process rights under the 5th and 14th Amendments to the United States Constitution were violated when the prosecutor failed to disclose exculpatory evidence to the defense.

Proposition VI:     As a result of juror bias, Mr. Richie was denied his right to a trial and sentencing by an impartial jury in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Proposition VII:    Misrepresentations by members of the jury that would have supported a reason to challenge those jurors for cause denied Mr. Richie a trial before an impartial jury as required by the Sixth, Eighth, and Fourteenth Amendments.

Proposition VIII:   The erroneous heinous, atrocious, and cruel instruction given by the trial court could not have been harmless in light of the trial court's specific factual findings on the nonexistence of physical abuse or torture.

Proposition IX:     Mr. Richie's fundamental right to a presumption of innocence was violated because of the unwarranted, excessive security measures taken by the trial court.

Proposition X:      The jury was not properly instructed regarding life without parole, and as a result, Mr. Richie was denied due process of law and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments.

Proposition XI:     Collateral information provided further support for claims that the trial court committed reversible error for violating Mr. Richie's Sixth Amendment [right] to confrontation and by not granting a new trial to Mr. Richie when the State's Medical Examiner made reference to the confession of the co-defendant during his testimony, thus improperly introducing a statement by the co-defendant which inculpated Mr. Richie.

Proposition XII:    This court erred in finding that the evidence effectively precluded

8

every reasonable hypothesis except that of guilt with respect to Mr. Richie's conviction for robbery with a firearm.

Proposition XIII:     This court erred in failing to consider that the reason the trial court refused to issue a second-degree murder instruction was because of the felony murder part of the charge and not because the evidence was insufficient for the instruction.

Proposition XIV:     The trial court did not have jurisdiction to try Mr. Richie as he had not been properly bound over for the offenses.

Proposition XV:     The cumulative effect of the errors created at trial and on appeal created error of constitutional dimensions, and deprived Mr. Richie of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The OCCA denied all requested relief. Richie v. State of Oklahoma, 957 P.2d 1192 (Okla. Crim. App. 1998).

Petitioner filed the instant petition for writ of habeas corpus on February 10, 1999 (Dkt. # 6). In his petition, Petitioner raises the following twenty-one (21) grounds of error:

Ground 1:     Several jurors in Mr. Richie's case harbored biases that would have caused them to be stricken for cause; they hid those biases by giving dishonest answers on *voir dire*.

Ground 2:     The State failed to disclose or the defense failed to obtain and present evidence Mrs. Launhardt was left alive by the defendants, then expired through accident or misfortune.

Ground 3:     Trial counsel failed to investigate and present expert evidence Mrs. Launhardt's death was unintentional.

Ground 4:     The Medical Examiner essentially introduced the co-defendant's formal statement as to the manner of death, without medical foundation and without the opportunity for Mr. Richie to confront the co-defendant.

Ground 5:     Mr. Richie was deprived of a constitutionally required lesser included offense instruction.

Ground 6:     Trial counsel failed to investigate and to develop mental state evidence

9

to support an intoxication defense and otherwise negate intent.

Ground 7:       The evidence was insufficient to support a conviction for malice murder.

Ground 8:       The evidence presented by the State of Oklahoma was insufficient to sustain Mr. Richie's convictions for the charge of kidnaping for extortion and robbery by firearm.

Ground 9:       Mr. Richie's trial in a county where no crime was committed violates the Fourteenth Amendment.

Ground 10:      Mr. Richie's trial counsel was ineffective.

Ground 11:      Oklahoma's refusal to apply the rule in <u>Mitchell v. State</u>[3] to Mr. Richie violated his constitutional rights under the Sixth, Eighth and Fourteenth Amendments.

Ground 12:      Mr. Richie was unconstitutionally deprived of the right to have his conviction for first degree murder reversed for infirmities in the information and instructions.

Ground 13:      Mr. Richie is entitled to habeas corpus relief because his death sentence is grounded on a flawed determination he is guilty of murdering the decedent to avoid lawful arrest or prosecution.

Ground 14:      The jury was misinstructed on the "heinous, atrocious, or cruel" aggravating circumstance and there was insufficient evidence to support the aggravator.

Ground 15:      The district court erred in not granting habeas relief based on the unconstitutionality of the "continuing threat" aggravator.

Ground 16:      Mr. Richie's death sentence is constitutionally infirm because his sentencing jury was not informed of the meaning and significance of the life without parole sentencing option, an error his appellate lawyer did nothing to correct.

Ground 17:      An erroneous instruction offered the jury an unauthorized and unconstitutional path to a death sentence.

---

[3] 876 P.2d 682 (Okla. Crim. App. 1993).

Ground 18:        Fundamental error in other sentencing instructions deprived Mr. Richie of his constitutional rights to an individualized sentencing proceeding, to be free from the arbitrary imposition of the death penalty, and to a meaningful review of his death sentence.

Ground 19:        Introduction of victim impact evidence in this case violated the Constitution.

Ground 20:        Appellate counsel failed to present critical arguments in Mr. Richie's direct appeal.

Ground 21:        Mr. Richie is insane or may become insane and may not be executed.

A response was filed on March 4, 1999 (Dkt. # 7), followed by Petitioner's reply on May 26, 1999 (Dkt. # 8). Petitioner filed a notice of supplemental authority (Dkt. # 9) on April 27, 2000, and again on July 31, 2000. (Dkt. # 10).  Respondent filed his response to supplemental authority on August 9, 2000 (Dkt. # 12). Petitioner's reply was filed August 24, 2000 (Dkt. # 13).

By Order filed January 21, 2003, this Court granted Petitioner's request for an evidentiary hearing on the issues raised in the second, third, sixth and tenth grounds for relief (Dkt. # 15 at 11). Following an evidentiary hearing, Magistrate Judge Sam A. Joyner recommended that the District Court grant a conditional writ of habeas corpus on the ground that Petitioner's trial counsel was ineffective for failing to properly cross-examine Dr. Hemphill (Dkt. # 52). This Court adopted and affirmed the Report and Recommendation of the Magistrate Judge on April 26, 2004 (Dkt. # 55). The remaining issues were not addressed in this Court's April 26th Order. Accordingly, the only issue presented to, and ruled upon by, the Tenth Circuit Court of Appeals in Respondent's appeal was whether defense counsel rendered ineffective assistance of counsel in cross-examining Dr. Hemphill. Richie, 417 F.3d at 1118. As noted above, the Circuit Court reversed the conditional grant of habeas corpus relief and remanded for further proceedings. Id. at 1125.

Following remand from the Tenth Circuit, Petitioner filed additional notices of supplemental

11

authorities (Dkt. # s 74, 76). Respondent filed responses (Dkt. # s 75, 77), and Petitioner filed a combined reply (Dkt. # 78).  This Court will address each of Petitioner's grounds for relief, except the previously decided claim of ineffective assistance of trial counsel for failing to adequately cross-examine Dr. Hemphill.

## GENERAL CONSIDERATIONS

### I.      Exhaustion

Federal habeas corpus relief is generally not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. §2254(b). Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994). See also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of exhaustion requirement). In every habeas case, the court must first consider exhaustion. Harris, 15 F.3d at 1554. "...[I]n a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). The Supreme Court has long held that a federal habeas petitioner's claims should be dismissed if the petitioner has not exhausted available state remedies as to any of his federal claims. Id. at 731 (citing Ex parte Royall, 117 U.S. 241 (1886)); Rose v. Lundy, 455 U.S. 509 (1982); Castille v. Peoples, 489 U.S. 346 (1989); 28 U.S.C. § 2254(b) (codifying the rule).

The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts. Therefore, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). State courts must have the rightful

opportunity to adjudicate federal rights. The "[p]rinciples of exhaustion are premised upon recognition by Congress and the Court that state judiciaries have the duty and competence to vindicate rights secured by the Constitution in state criminal proceedings." <u>Michael Williams v. Taylor</u>, 529 U.S. 420, 436-37 (2000).

Unless otherwise specifically addressed in this opinion, the exhaustion requirement for each proposition is satisfied.

**II.    Procedural Bar**

The Supreme Court has also considered the effect of state procedural default on federal habeas review, giving strong deference to the important interests served by state procedural rules. <u>See</u>, <u>e.g.</u>, <u>Francis v. Henderson</u>, 425 U.S. 536 (1976); <u>Lee v. Kemna</u>, 534 U.S. 362 (2002). Habeas relief may be denied if a state disposed of an issue on an adequate and independent state procedural ground. <u>Coleman</u>, 501 U.S. at 750. <u>See also</u> <u>Romero v. Tansy</u>, 46 F.3d 1024, 1028 (10th Cir. 1995); <u>Brecheen v. Reynolds</u>, 41 F.3d 1343, 1353 (10th Cir. 1994).

A state court's finding of procedural default is deemed "independent" if it is "separate and distinct from federal law." <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985); <u>Duvall v. Reynolds</u>, 139 F.3d 768, 796-97 (10th Cir. 1998).  If the state court finding is applied "evenhandedly to all similar claims," it will be considered "adequate." <u>Maes v. Thomas</u>, 46 F.3d 979, 986 (10th Cir. 1995) (citing <u>Hathorn v. Lovorn</u>, 457 U.S. 255, 263 (1982)).

To overcome a procedural default, a habeas petitioner must demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. <u>Coleman</u>, 501 U.S. at 749-50; <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977). This Court will

address procedural bar issues as they arise in the analysis of Petitioner's claims.

## III.    Standard of review - AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or "the Act") made significant changes to federal habeas corpus law, specifically delineating the circumstances under which a federal court may grant habeas relief. Title 28, Section 2254 (d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under §2254(d), this Court may grant a writ of habeas corpus only if the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law, decided the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts, or unreasonably applied the governing legal principle to the facts of Petitioner's case. Terry Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. It is not necessary, however, that the state court cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court law. Early v. Packer, 537 U.S. 3, 8 (2002).

Petitioner's habeas proceedings in the instant matter commenced on January 20, 1999 (Dkt.

14

# 1), well after the effective date of AEDPA. Although the crimes for which Petitioner was convicted predate the law's enactment, the provisions of the Act govern pursuant to <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997). The Court finds that the AEDPA is applicable, and will apply it herein to the extent Petitioner's claims are cognizable in a federal habeas corpus proceeding.

### **GROUNDS FOR RELIEF**

The Court now turns to Petitioner's specific grounds for requesting habeas corpus relief.

**I.      Concealed juror bias (ground 1)**

Petitioner alleges in his first ground for relief that he was denied a fair trial before an impartial jury because several jurors in his case harbored biases that would have caused them to be stricken for cause. He further claims such jurors hid their biases by giving dishonest answers during *voir dire.* To support his claim, Petitioner relies upon juror interviews conducted in November and December of 1996.

Petitioner first contends that, despite a jury instruction which forbid the jury from inferring guilt from the fact the Petitioner did not testify at his trial, several jurors believed he should, and would, have taken the stand if he were innocent. Petitioner also claims that post-conviction juror interviews conducted in 1996 reveal that several jurors believed "the death penalty should be automatic for first degree murder." <u>See</u> Dkt. # 6 at 16. According to Petitioner, these alleged biases were concealed by the jurors during *voir dire*. Had the jurors been honest, Petitioner asserts, they would have been removed for cause from the jury selection pool. He argues that he was deprived of his constitutional right to a fair trial as a result of juror bias which was not revealed during *voir dire*.

Respondent counters with two arguments. First, he contends that the issue is not cognizable in federal habeas court because the issue is a matter of state law and the OCCA's ruling was based

on independent and adequate state law grounds. Alternatively, he argues that the OCCA's decision is "in harmony" with Supreme Court case law.

This issue was first raised by Petitioner in post-conviction proceedings when he alleged that misrepresentations by jurors denied him a trial before an impartial jury as required by the Sixth, Eighth, and Fourteenth Amendments. Denying relief on the merits, the OCCA held that Petitioner's claim was specifically prohibited by Oklahoma statutory law:

> Richie's claim is specifically prohibited by 12 O.S.1991, § 2606(B) which states in pertinent part:
>
> > Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify as to any matter or statement occurring during the course of the jury's deliberations or as to the *effect of anything upon his or another juror's mind or emotions as influencing him* to assent to or dissent from the verdict or indictment or *concerning his mental processes during deliberations.* [emphasis added]
>
> *See also Hall v. State*, 1988 OK CR 174, 762 P.2d 264, 266-67; *Weatherly v. State*, 1987 OK CR 28, 733 P.2d 1331, 1334-35; *Wacoche v. State*, 1982 OK CR 55, 644 P.2d 568, 572-73. Therefore, this allegation of error is denied.

Richie v. Oklahoma, 957 P.2d 1192, 1197-98 (Okla. Crim. App. 1998). Finding the claim lacked merit because it was prohibited by state law, the OCCA conducted no analysis of Petitioner's federal constitutional claim. Nonetheless, the OCCA's decision was an adjudication on the merits. Contrary to Respondent's position, the issue is properly before this Court. Because the OCCA undertook its analysis of Petitioner's claim entirely under state law without addressing the merits of Petitioner's federal claim, this Court will address the claim *de novo* and AEDPA deference does not apply. Brown v. Sirmons, 515 F.3d 1072, 1087 (10th Cir. 2008) (citing Harris v. Poppell, 411 F.3d 1189, 1196 (10th Cir. 2005)).

Under the Sixth Amendment to the Constitution, a defendant has a right to trial by an

impartial jury. One "touchstone of a fair trial is an impartial trier of fact--a jury capable and willing to decide the case solely on the evidence before it." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). Petitioner maintains that, according to the test set forth in McDonough, his constitutional right to an impartial jury was violated. The McDonough Court articulated the standard as follows:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.

Id. at 556. Emphasizing the practical necessities of judicial management and recognizing that perfection is not generally achievable in a trial, the Supreme Court explained, "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." Id. The Tenth Circuit Court of Appeals has held that the McDonough test "is not satisfied by showing that a juror provided a mistaken, though honest answer, but rather 'is directed at intentionally incorrect answers.'" United States v. Cerrato-Reyes, 176 F.3d 1253, 1259 (10th Cir. 1999) (quoting Gonzales v. Thomas, 99 F.3d 978, 983 (10th Cir. 1996)).

Petitioner relies upon affidavits acquired three years after his jury trial to support his proposition that jurors "failed to answer honestly" material questions on *voir dire*. Petitioner cites to the Affidavit of Kimberly D. Heinz, an attorney/investigator employed by the Oklahoma Indigent Defense System ("OIDS"), who conducted interviews of several jurors in November and December of 1996. See Petitioner's Application for Post-Conviction Relief, Addendum Vol. 2, App., Ex. 6. Ms. Heinz' affidavit is clearly inadmissible hearsay as it contains no direct evidence supporting Petitioner's claim. The affidavit is a recitation of various interviews with jurors from Petitioner's trial. Even assuming the Court could consider the affidavit of the investigator, it simply represents

17

"brief, conclusory perceptions and opinions of [the referenced] jurors, which do not reflect any misrepresentation by themselves or other jurors during *voir dire*." Sallahdin v. Gibson, 275 F.3d 1211, 1223 (10th Cir. 2002) (citing United States v. McVeigh, 118 F.Supp.2d 1137, 1153 (D. Colo. 2000) ("statements made by trial jurors after they experienced the entire trial and sentence hearing and after deliberating on the verdicts are not reasonably probative. . .")).[4] None of the referenced jury interviews detailed in Ms. Heinz' affidavit support Petitioner's assertion that the jurors were intentionally dishonest in their answers to *voir dire* questions.

Petitioner also proffers the 1996 affidavit of juror Michelle Lynn Leek. See Petitioner's Application for Post-Conviction Relief, Addendum Vol. 2, App., Ex. 31.  Again, this affidavit does not reflect misrepresentation on juror Leek's part during *voir dire*. It merely expresses her perceptions and opinions of the trial and other jurors. Petitioner's reliance on this affidavit is unavailing.

Petitioner urges this Court to find that multiple jurors were biased against him because he did not testify, and they harbored a concealed belief that the death penalty was the only appropriate punishment for first degree murder. However, the record is devoid of any improper conduct by the jurors. As noted by Petitioner, all the jurors on the panel indicated during *voir dire* that they believed and understood that Petitioner had a right not to testify (Dkt. # 6 at 18). Additionally, Petitioner acknowledges that all jurors stated during *voir dire* that they would consider all punishments

---

[4] For example, according to Ms. Heinz' affidavit, juror Michael Tidwell stated that Petitioner did a poor job, never looked at the jury, and he "would have handled it [the trial] differently" than Petitioner's attorneys (Petitioner's Application for Post-Conviction Relief, Addendum Vol. 2, App., Ex.6). When Ms. Heinz asked juror Margaret Tarrant about her impressions of the defendant, Ms. Tarrant replied that she was surprised, didn't notice any reactions from him, and he was "just kind of stone faced." Id. These types of statements by jurors made several years after a trial are not probative of the issues raised by Petitioner concerning the jurors' honesty during *voir dire*.

available and would consider mitigation evidence before deciding upon a punishment (Id. at 21). He now concludes that, because he was found guilty and given a death sentence, the jurors lied during *voir dire* and concealed their biases.

As explained by the OCCA, it is well settled under Oklahoma state evidentiary rules that individual jurors generally cannot impeach the jury's verdict. See Okla. Stat. tit. 21, § 2606(B). Although evidence concerning external influences on a jury may be admissible, a juror "may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict." Id. Nor may a juror's affidavit concerning internal jury deliberations be considered for the purposes of inquiring into the validity of a verdict. Id. A similar federal rule "is grounded in the common-law rule against admission of jury testimony to impeach a verdict." Tanner v. United States, 483 U.S. 107,121 (1987) (citing Fed. R. Evid. 606(b) identical to language in Okla. Stat. tit. 21, § 2606(B)). As the Supreme Court once said, if such a practice were allowed,

> [A]ll verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

McDonald v. Pless, 238 U.S. 264, 267-68 (1915). Absent any showing on the record of either actual or implied juror bias, Petitioner has failed to demonstrate constitutional violations by his jury. Having failed to satisfy the first prong of the McDonough test to demonstrate that a juror was dishonest during *voir dire*, and having failed to show actual or implied juror bias in any manner, this Court finds that Petitioner's constitutional rights to a fair trial by an impartial jury have not been

violated as alleged in his ground one claim. Habeas relief shall be denied on this proposition.

**II.      Exculpatory evidence (ground 2)**

In his second proposition, Petitioner claims that certain exculpatory information was withheld by the State in violation of his due process rights. Specifically, he alleges that the prosecution wrongly withheld evidence concerning: (1) a statement by co-defendant Waller; (2) the coercive tactics used during Waller's interrogation leading to his formal statement; and (3) doubts that the police expressed to the medical examiner regarding the credibility of Waller's statement. Alternatively, he claims that his trial counsel was ineffective for failing to discover the alleged beneficial evidence and placing it before a jury. Petitioner requests habeas relief for these occurrences by reliance primarily upon the doctrines enunciated in Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).

This Court granted Petitioner an evidentiary hearing on his ground two claims, in addition to grounds three, six and ten (Dkt. # 15). Following the evidentiary hearing, the Magistrate Judge issued his Report and Recommendation (Dkt. # 52), concluding that Petitioner's trial counsel failed to provide constitutionally effective assistance as alleged in ground three. Recommending that the District Court grant Petitioner's request for a writ of habeas corpus on ground three, the Magistrate Judge did not address the other issues presented by Petitioner (id. at 26), including the ground two claims. Accordingly, the ground two claims were not addressed in this Court's Order adopting the Report and Recommendation (Dkt. # 55). They shall be analyzed at this time.

The issues set forth in ground two were first raised in Petitioner's application for post-conviction relief. Respondent contends that the claims were procedurally defaulted in state court. Petitioner replies that the OCCA's procedural ruling was based upon restrictions found in

20

Oklahoma's new post-conviction law which was not in effect at the time of Petitioner's direct appeal. Relying upon Walker v. Attorney General of Oklahoma, 167 F.3d 1339, 1345 (10th Cir. 1999), Petitioner asserts that the procedural bar is inapplicable.

The doctrine of procedural default generally prohibits a federal court from considering a specific habeas claim where the state's highest court clearly denied the claim on procedural grounds. Gray v. Netherland, 518 U.S. 152 (1996) (Petitioner's failure to raise Brady claim in state court implicates the requirements in habeas of procedural default).  Only upon a showing of "cause" and "prejudice" is a federal court permitted to entertain a defaulted claim.  Murray v. Carrier, 477 U.S. 478, 492 (1986); Brecheen v. Reynolds, 41 F.3d 1343, 1353 (10th Cir. 1994).  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded . . . efforts to comply with the State's procedural rule."  Murray, 477 U.S. at 488.  Examples of such external factors include the discovery of new evidence, a change in the law, and interference by state officials.  Id.

As for prejudice, a petitioner must show "not merely that the errors of the trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  United States v. Frady, 456 U.S. 152, 170 (1982).

As an alternative to showing "cause and prejudice," a petitioner may attempt to show that dismissal of his instant claim on the ground of procedural default will result in a "fundamental miscarriage of justice."  Such a showing, however, is very difficult to make as it requires a petitioner to demonstrate that he is "actually innocent" of the crime for which he was convicted.  See Sawyer v. Whitley, 505 U.S. 333 (1992).

21

As stated previously, the OCCA denied this claim on procedural grounds finding in its post-conviction decision:

> In his fifth proposition, Richie claims the prosecution failed to disclose exculpatory material to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Richie specifically contends the State failed to provide trial counsel with Mr. Waller's initial statement in which he informed the police he was the last person to see Mrs. Launhardt alive. He further maintains the State failed to reveal that the police had "brutalized" Mr. Waller into "confessing" that Richie killed Mrs. Launhardt.
>
> Under the revised post-conviction procedure act, Richie must show this claim was not and could not have been raised on direct appeal and that it supports a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent. 22 O.Supp. 1995, § 1089(C)(1) & (2). We have carefully reviewed this allegation, but are unable to conclude this claim could not have been raised on direct appeal. Mr. Waller's statement either was known or could have been obtained prior to Richie's direct appeal being filed. Moreover, we are unable to conclude this claim would have changed the outcome of the trial or that it supports the conclusion that Richie is factually innocent. Accordingly, this proposition is waived.

Richie v. Oklahoma, 957 P.2d 1192, 1195 (Okla. Crim. App. 1998).

Although Petitioner initiated his direct appeal in 1993, the state court relied upon the 1995 amended version of Oklahoma's procedural default statute. Citing Walker v. Attorney General of Oklahoma, 167 F.3d 1339, 1344 (10th Cir. 1999), Petitioner claims no federal procedural bar can arise from the OCCA's decision (Dkt. # 8 at 8). In Walker, the Tenth Circuit Court of Appeals held that the state court's application of the 1995 amendments to an alleged default that occurred before those amendments were enacted would not bar federal review of the claim. However, the Circuit Court has subsequently explained that the Walker decision is limited, and only governs claims based on changes in law which would have sufficed to excuse default under the statutory scheme in effect when the procedural omission occurred, but which are barred by application of the new procedural statute." Smith v. Mullin, 379 F.3d 919, 926 n.3 (10th Cir. 2004). "[I]f claims omitted on direct state

appeal would have been barred on state post-conviction anyway, even under Oklahoma's pre-1995 law (for example, if they rested on authority established at the time of direct appeal)," Walker cannot be applied to excuse Petitioner's default. Id. (quoting Cargle v. Mullin, 317 F.3d 1196, 1201-02 (10th Cir. 2003)). In Petitioner's case, the post-conviction act in effect at the time of Petitioner's direct appeal, 22 O.S. 1991, § 1086,[5] presents an adequate basis to bar federal review of his Brady claim. The Tenth Circuit has found § 1086 to be an "adequate, as well as independent, state ground" which would bar federal habeas review. Steele v. Young, 11 F.3d 1518, 1521 (10th Cir. 1993). Based upon this Court's understanding of Oklahoma's prior post-conviction act and § 1086, the Court finds that Petitioner's Brady claim is procedurally barred. Hale v. Gibson, 227 F.3d 1298, 1330 (10th Cir. 2003) (Oklahoma's Post-Conviction Procedure Act "is an adequate state bar to Brady claims raised on post-conviction review that could have been raised on direct appeal.").

Petitioner alternatively claims in ground two of this habeas proceeding that his trial counsel was ineffective for failing to discover the alleged beneficial evidence and placing it before the jury. See Dkt. # 6 at 22. Respondent responds that, "Petitioner has failed to provide specific argument which shows that counsel's performance was professionally unreasonable." See Dkt. # 7 at 16-17.

However, Respondent has not advised the Court that this portion of Petitioner's ground two claim may be unexhausted, and the Court has been unable to find where Petitioner raised this

---

[5]This section provided as follows:

All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior application.

ineffective assistance of counsel claim before the state court.[6] Petitioner makes no mention of the exhaustion status of the ineffective assistance of counsel portion of his ground two claim. Respondent refers only to Petitioner's <u>Brady</u> claim when he advises that Petitioner's ground two claim is exhausted for purposes of habeas corpus review (Dkt. # 7 at 11). Nonetheless, the Court finds that Petitioner has never "fairly presented" to the OCCA that portion of his ground two claim in which he asserts that his trial counsel was ineffective for failing to discover evidence of Waller's early statements, police coercion in obtaining Waller's official statement, and police doubts about the State's theory.  Although the Court could require Petitioner to return to state court to raise the claim in a second post-conviction application, the OCCA routinely applies a procedural bar to such claims unless the petitioner provides "sufficient reason" for his failure to raise the claim in an earlier proceeding.  Okla. Stat. tit. 22, § 1086; <u>Moore v. State</u>, 889 P.2d 1253 (Okla. Crim. App. 1995). Because this claim would be subject to a procedural bar in the state courts, the Court finds it would be futile to require Petitioner to exhaust this claim.  <u>See</u> <u>Duckworth v. Serrano</u>, 454 U.S. 1, 3 (1981) (the futility exception is a narrow one, and is supportable "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief"); <u>see</u> <u>also</u> <u>Coleman</u>, 501 U.S. at 722; <u>Steele</u>, 11 F.3d at 1524. Accordingly, because exhaustion would be futile, the portion of Petitioner's ground two claim relating to ineffective assistance of trial counsel is not barred by the exhaustion requirement.

---

[6] Petitioner's <u>Brady</u> claim is set forth in Proposition 5 of his application for post-conviction relief. No mention is made of counsel's ineffectiveness. His ineffective assistance of counsel claims are set forth in Proposition 1 of the post-conviction application, but no reference is made to an ineffectiveness claim for failing to investigate, discover and present the alleged exculpatory evidence. <u>See</u> Petitioner's Application for Post-Conviction Relief, Addendum 1, Vol. 1 in OCCA Case No. PC-96-1556.

However, under the procedural default doctrine, this Court may not consider Petitioner's ground two ineffective assistance of trial counsel claim unless he is able to show cause and prejudice for the procedural default, or demonstrate that a fundamental miscarriage of justice would result if his claim is not considered. See Coleman, 501 U.S. at 750. As stated earlier, the "cause" standard requires Petitioner to "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." Murray, 477 U.S. at 488. He must also show "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982). Alternatively, the "fundamental miscarriage of justice" exception requires Petitioner to demonstrate that he is "actually innocent" of the crime of which he was convicted. McCleskey v. Zant, 499 U.S. 467, 495 (1991).

Petitioner does not attempt to show cause and prejudice for his failure to present this issue to the state courts. Nor does he argue that a fundamental miscarriage of justice would occur if his claim is not considered. Therefore, because Petitioner has not demonstrated "cause and prejudice" or that a "fundamental miscarriage of justice" will result, the Court concludes that it is procedurally barred from considering Petitioner's Ground Two claim on the merits, insofar as the allegations relate to ineffective assistance of trial counsel. Coleman, 501 U.S. at 724.

## III.    Ineffective assistance of trial counsel (ground 3)

In his third ground for habeas corpus relief, Petitioner alleges that his trial counsel was constitutionally ineffective under the standards established in Strickland v. Washington, 466 U.S. 668 (1984). More specifically, Petitioner asserts that his trial counsel: (1) failed to obtain a defense expert to support the theory that Mrs. Launhardt died of a cardiac arrhythmia rather than choking through manual strangulation; and (2) failed to adequately cross-examine the medical examiner, Dr.

Hemphill, regarding the manner of death. Because the second part of this ground has been definitively ruled upon by the Tenth Circuit Court of Appeals, see Richie, 417 F.3d at 1117, the only ground three issue remaining for consideration is whether trial counsel was ineffective for failing to obtain a forensic expert to demonstrate this was not a deliberate ligature strangulation death.

Respondent argues that Petitioner's ground three claims of ineffective assistance of trial counsel are procedurally barred. Petitioner urges this Court to review such claims on the merits. Petitioner first raised his claims of ineffective assistance of trial counsel in his application for post-conviction relief. The OCCA denied relief, citing Walker v. State, 933 P.2d 327, 332 (Okla. Crim. App. 1997) (denied review of ineffective assistance of counsel claim on the merits because the facts generating those claims were available to Walker's direct appeal attorney and thus either *were* or *could have been* used in his direct appeal). The OCCA found that Petitioner's ineffective assistance of trial counsel claims were barred because they "do not turn on facts and information unavailable at the time of his direct appeal." Richie, 957 P.2d at 1197.  The state court's procedural bar as applied to the ineffective assistance of counsel claims was an "independent" state ground because "it was the exclusive basis for the state court's holding." Maes, 46 F.3d at 985. The question of whether the state procedural bar is "adequate" is more difficult when applied to an ineffective assistance of counsel issue.

When the underlying claim is ineffective assistance of counsel, the Tenth Circuit Court of Appeals has recognized that countervailing concerns justify an exception to the general rule of procedural default. Brecheen v. Reynolds, 41 F.3d 1343, 1363 (10th Cir. 1994) (citing Kimmelman v. Morrison, 477 U.S. 365 (1986)).  The unique concerns are "dictated by the interplay of two factors: the need for additional fact-finding, along with the need to permit the petitioner to consult with

separate counsel on appeal in order to obtain an objective assessment as to trial counsel's performance." Id. at 1364 (citing Osborn v. Shillinger, 861 F.2d 612, 623 (10th Cir. 1988)). The Tenth Circuit explicitly narrowed the circumstances requiring imposition of a procedural bar on ineffective assistance of counsel claims first raised collaterally in English v. Cody, 146 F.3d 1257 (10th Cir. 1998). In English, the circuit court concluded that:

> Kimmelman, Osborn, and Brecheen indicate that the Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone. All other ineffectiveness claims are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied.

Id. at 1264 (citation omitted).

After reviewing the record in the instant case in light of the factors identified in English, the Court concludes the OCCA's finding of a procedural bar is not adequate to preclude federal habeas review because the claim cannot be resolved upon the trial record alone. As a result, the Court will evaluate the merits of Petitioner's claim under the now familiar two-pronged Strickland standard. The Strickland test requires a showing of both deficient performance by counsel and prejudice to Petitioner as a result of the deficient performance. Strickland, 466 U.S. at 687.

To satisfy the deficient performance prong of the test, Petitioner must overcome a strong presumption that counsel's conduct fell within the "wide range of reasonable professional assistance [that] . . . might be considered sound trial strategy." Brecheen, 41 F.3d at 1365 (citations omitted); see also Berkell v. Crouse, 468 F.3d 684, 689 (10th Cir. 2006). "A claim of ineffective assistance must be reviewed from the perspective of counsel at the time and therefore may not be predicated on the distorting effects of hindsight." Brecheen, 41 F.3d at 1365 (citations omitted). "[D]ecisions alleged to be deficient must not be viewed in a vacuum; the court must assess such actions from the

27

vantage point of counsel at the time of their making and with all relevant facts in mind." Richie, 417 F.3d at 1120.  Finally, the focus of the first prong is "not what is prudent or appropriate, but only what is constitutionally compelled."  Id.  To establish the prejudice prong of the test, Petitioner must show that the allegedly deficient performance prejudiced the defense; namely, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  Strickland, 466 U.S. at 694.  Petitioner has the burden of demonstrating prejudice.  Id. at 696.  Failure to establish either prong of the Strickland standard will result in denial of relief.  Id.; Hatch v. Oklahoma, 58 F.3d 1447, 1457 (10th Cir.1995).

With regard to Petitioner's claim that he received ineffective assistance from his trial counsel because counsel failed to procure a defense expert whose opinions would have contradicted the manner of death propounded under the state's theory, the Court finds counsel was not constitutionally ineffective. Because Petitioner was granted an evidentiary hearing on this ineffectiveness claim, the Court has reviewed additional evidence proffered by Petitioner in the hearing and has conducted an independent analysis of Petitioner's allegations.

Dr. Peter H. Proctor, testified at the evidentiary hearing that, in his opinion, Mrs. Launhardt "died of cardiac arrest secondary to vasovagal reflex which is, in turn, secondary to a ligature around her neck." Ev. Hr'g Tr. at 150. He explained that a vasovagal reflex death differs from an asphyxial death such as the one described by Dr. Hemphill (Id. at 155). The classic signs of an asphyxial death, such as ligature strangulation, are conjunctival petechiae or conjunctival hemorrhages, and skin petechiae. (Id. at 158). No mention was made of petechiae or hemorrhages in Dr. Hemphill's autopsy report, nor did Dr. Proctor see such signs in the photographs of the victim (Id. at 158-59). Dr. Proctor also testified that a vasovagal reflex death could occur without much pressure on the neck and would

28

be consistent with just having something tied around the victim's neck and her moving around a little bit (Id. at 151). In Dr. Proctor's opinion, Mrs. Launhardt's death was not an asphyxial death. Petitioner argues that his trial counsel's failure to investigate and present this "compelling evidence" in support of the defense's left-alive theory constituted ineffective assistance of counsel in violation of the Sixth Amendment (Dkt. # 45 at 4-5).

Petitioner's counsel, Melody Brannon, also testified at the evidentiary hearing. She explained that at the time of trial, she did not find it necessary to call another expert to testify because she believed that the state's witness, Dr. Hemphill, supported the defense theory that Mrs. Launhardt was left alive. See Ev. Hr'g Tr. 29-30. Ms. Brannon testified as follows:

> To my memory, essentially when the government's own expert witness, which is what I consider a medical examiner, was testifying in our favor, I didn't see a need to call in an opposing expert witness.

Id. at 30. Petitioner acknowledges that, "Ms. Brannon premised her defense on the notion the medical examiner, Dr. Hemphill, was a defense witness, would testify in support of the theory the victim was left alive, and would testify unfavorably about the State's theory of a deliberate killing." See Dkt. # 45 at 3.

In hindsight, it can certainly be argued that Dr. Proctor's testimony may have had a significant impact on the jury's decision. However, Ms. Brannon's decision not to call an expert "must be reviewed from the perspective of counsel at the time." Brecheen, 41 F.3d at 1365. In order for counsel's performance to be constitutionally ineffective, her decision to forego calling an expert witness such as Dr. Proctor, must have been completely unreasonable and "outside the wide range of professionally competent assistance." Barkell, 468 F.3d at 689. Based upon counsel's own testimony, and Petitioner's recognition of the rationale behind her decision, this Court cannot find

that Ms. Brannon's decision was not sound trial strategy. In order to be constitutionally ineffective, a "strategic decision must have been completely unreasonable, not merely wrong." Romano v. Gibson, 278 F.3d 1145, 1153 (10th Cir. 2002). Counsel believed that Dr. Hemphill would provide the expert testimony she needed to present to the jury. From her vantage point at the time, this belief was not unreasonable. Thus, Petitioner has failed to demonstrate that counsel's performance was constitutionally deficient under the Strickland guidelines. Having found that trial counsel's performance was not constitutionally deficient, it is not necessary to address the prejudice prong of the Strickland test. Bryan v. Mullin, 335 F.3d 1207, 1216 (10th Cir. 2003). Petitioner is not entitled to habeas corpus relief on his ground three claim.

**IV.     Right to confront witness (ground 4)**

Petitioner alleges, in his fourth ground for relief, that inadmissible statements of co-defendant Waller were presented through the testimony of expert witness, Dr. Hemphill, thereby depriving Petitioner of his Sixth Amendment right of confrontation. Petitioner also contends that his due process rights were violated when Dr. Hemphill was allowed to base his expert opinion as a medical examiner on the inadmissable statements of Mr. Waller.

The Sixth Amendment claim was rejected by the OCCA on direct appeal:

In his seventh proposition of error, appellant claims that his Sixth Amendment right to confrontation was violated by certain testimony of the medical examiner at trial. Specifically, he alleges that the subject testimony made reference to statements made by his accomplice and improperly inculpated appellant. Relying on *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968), appellant claims the introduction of this evidence violated his constitutional right to confront and cross-examine the declarant of this highly prejudicial evidence.

We find the instant case distinguishable from *Bruton*. In *Bruton*, the United States Supreme Court held a defendant's Sixth Amendment right of confrontation is violated when "his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial . . ." *Fowler v. State*, 779 P.2d

30

at 1622-23. The statement made by the medical examiner which is at issue is "I do have access and have had access since prior to the autopsy to information that someone who purported to have been there. . . ." In response to this comment, defense counsel objected and the trial court sustained the objection. Furthermore, the trial court admonished the jury to disregard the medical examiner's answer.

> We find that this statement does not constitute a violation of the Confrontation Clause. This statement was not presented to the jury as any form of a confession by a codefendant. More importantly, this statement did not name or directly implicate appellant as being present at the scene or taking part in the murder of the victim. Therefore, the alleged improper statement made by the medical examiner does not fall within the realm of those statements contemplated by *Bruton*. Moreover, the trial court's admonishment to the jury cured any possible error because the statement in question cannot be said to have determined the outcome of this case. *Price v. State*, 546 P.2d 632, 636 (Okl.Cr.1976); *Wimberli v. State*, 536 P.2d 945, 951-52 (Okl.Cr.1975). This proposition of error also fails.

Richie, 908 P.2d at 277. Respondent contends that the OCCA's decision was in harmony with Bruton because Dr. Hemphill's statement was not presented to the jury as a confession by a codefendant, the statement was too far removed from other testimony for the jury to make a connection, and the statement did not name or directly implicate Petitioner as being present at the scene or taking part in the murder of the victim (Dkt. # 7 at 25).

The Sixth Amendment to the Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause in the Sixth Amendment is extended to the States by the Fourteenth Amendment, and guarantees the right of a criminal defendant to be confronted with the witnesses against him. Richardson v. Marsh, 481 U.S. 200, 206 (1987). Thus, in Petitioner's state court trial the Confrontation Clause prohibits the admission of testimonial hearsay unless the declarant was unavailable and there was a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 68 (2004). It is well established that the right of confrontation includes the right to cross-examine witnesses. See Pointer v. Texas, 380 U.S. 400, 404, 406-07 (1965). That right

of an accused to cross-examine witnesses against him or her is a major reason underlying the

Confrontation Clause.  Id.

At issue in this part of Petitioner's ground four claim is Dr. Hemphill's allusion to "someone

who purported to have been there" in the following portion of his direct examination by the

prosecutor, Mr. Gillert:

> Q:   Let me ask you this hypothetical: If someone were to bind her hands behind her and
> bind her feet as she was found, tie the ligature around her neck and tie it to the poll
> [sic] with the length of the rope, would it be consistent with your findings that they
> suspended the person by some lower extremity while they hung to affect the death in
> the manner in which you found, is that consistent?
>
> A:   Yes. As far as I can see, it would be consistent.
>
> Q:   Do you have any information that that is not the way it occurred?
>
> MS. BRANNON:      Objection, Your Honor.
>
> THE COURT:      Overruled.
>
> A:   I do have access and have had access since prior to the autopsy to information that
> someone who purported to have been there.
>
> MS. BRANNON:      Your Honor --
>
> THE COURT:      I'm going to sustain the objection. Did you hear the last
> question?
>
> MR. GILLERT:      My question is simply --
>
> THE COURT:      I'll admonishment [sic] the jury to disregard the answer and
> I'll sustain the objection.

T. Tr. Vol. II at 566-67. Petitioner argues that the presentation of this testimony concerning the

manner of Mrs. Launhardt's death was a violation of Bruton v. United States, 391 U.S. 123 (1968).

In Bruton, two defendants were accused of participating in the same crime and tried jointly before

the same jury. One of the defendants had confessed, naming and incriminating the other defendant

in his confession. The trial judge issued a limiting instruction to the jury telling them to consider the confession as evidence only against the codefendant who had confessed. Bruton held that the Constitution forbids the use of such a confession in a joint trial, despite the limiting instruction issued by the judge. The Supreme Court concluded that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant. Richardson v. Marsh, 481 U.S. 200, 201-02 (1987) (citing Bruton). Several factors differentiate Petitioner's claim from the Bruton scenario. First, Petitioner was not being tried jointly with co-defendant Waller. Second, the medical examiner used the neutral pronoun "someone" when purportedly referring to Mr. Waller.[7] Third, he made no reference to Petitioner, either directly or indirectly in describing the manner of death. Finally, no actual hearsay testimony was given because defense counsel's objection was sustained before Dr. Hemphill could complete his sentence about what "someone who purported to have been there" might have observed or described.  This Court finds that the OCCA did not unreasonably apply Supreme Court law.

Petitioner also contends that it was improper for Dr. Hemphill to rely on inadmissible hearsay evidence in making his determination as to the cause and manner of Mrs. Launhardt's death. This portion of his ground four claim is somewhat more troublesome. A similar argument was presented

---

[7] Although Petitioner assertively claims that the jury knew that Dr. Hemphill was referring to co-defendant Waller, this Court is unable to make such a positive conclusion. Because Dr. Hemphill was not allowed to complete his sentence, it is unclear whether he was going to refer to Waller's previous formal statement to the police or whether he was going to testify about something that one of the police officers or others at the crime scene had described or observed. The partial statement, "I do have access and have had access since prior to the autopsy to information that someone who purported to have been there..." is simply too general to presume he was definitely referring to Waller.

to the OCCA on direct appeal as a part of Proposition VII,[8] but was not addressed by the state appellate court in its discussion of that proposition. Accordingly, the Court will conduct a *de novo* review of this claim. Brown, 515 F.3d at 1087 (citing Harris v. Poppell, 411 F.3d 1189, 1196 (10th Cir. 2005)).

Dr. Hemphill testified that the cause of Mrs. Launhardt's death was asphyxiation. He supported that opinion as follows:

> Based on the circumstances under which the body was found, that is that it was partially suspended by this ligature being tied to a clothes bar or something like that in a closet, that she was lying face down with her face slightly off the floor, partially suspended in that sense, it's my opinion that suspension or partial suspension as in hanging probably played a major part in the mechanism, that is in putting enough pressure from this ligature on the blood vessels of the neck to cause asphyxiation.

T. Tr. Vol. II at 561. The prosecutor next asked Dr. Hemphill to explain what he believed "to be the most likely explanation about how she hung." Id. Petitioner's counsel objected and asked to approach the bench. Trial counsel argued that Dr. Hemphill should not be allowed to base his opinion on an inadmissible statement from Daniel Waller that Mrs. Launhardt was held up and suspended. Id. at 561-564. The trial court directed the prosecutor to rephrase his question, but ruled that Dr. Hemphill could testify as to how he believed the asphyxiation occurred. Id. at 564. Dr Hemphill then responded as follows to the prosecutor's question, "How could it have occurred?":

> A:   I want to be sure that I understand the question. How could it have occurred suggests to me that this is a very open-ended question, what possibilities would I entertain, but I'm not going to answer that question. I don't believe that's what you intend, but they're [sic] certain things that I think I can say that I believe occurred here.

---

[8] Although not couched in the same language as his habeas claim, Petitioner did argue on direct appeal that Dr. Hemphill testified beyond the area of his expertise and beyond the facts at the scene to conclude that someone had deliberately suspended Mrs. Launhardt, causing her death by asphyxiation. See Brief of Appellant at 60.

Number 1, the fact that this lady was tied, her hands tied behind her back, her feet tied together, a ligature tied behind her neck and then tied to something above her and that she was partially suspended by it to me is overwhelming evidence that somebody did this to her. So that's one thing.

MS. BRANNON:      Your Honor, I object to that answer. It's not based upon his expertise.

THE COURT:      Overruled, exception will be allowed. Continue on.

A:      So I believe this is a homicide. That is, I believe somebody else did this to her, she didn't do it to herself.

MS. BRANNON:      Same objection.

THE COURT:      Overruled.

A:      Beyond that there's not a whole lot more that I can say. I don't know how many people were involved. I don't have any evidence to indicate that. I don't know exactly what the person did. In what sequence and what he might have said or anything else.

All I can say is that this evidence indicates that someone killed this person by partially suspending her by the neck while she was bound and face down in the position which she was found.

Q:      To the mechanism to accomplish the partial suspension, what about that? What is your opinion of that?

A:      Well really all that I can say from the evidence that I can see here and in my examination of the body is that it appears that -- that as I said, someone partially suspended her, pulled her head up in this position while she was face down and accomplished the asphyxiation in that matter [sic]. What else they may have done I don't know.

Id. at 565-66.

Relying on Giglio v. U.S., 405 U.S. 150 (1972), Petitioner argues that Dr. Hemphill's opinion was unsupported by science, resulting in an exercise in deception before the jury. See Dkt. # 6 at 51-52. The Giglio court reaffirmed a long-standing rule that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" Id. at 766 (citing Mooney v. Holohan, 294 U.S. 103 (1935); Pyle v. Kansas, 317 U.S. 213 (1942)).

35

In Petitioner's case, there is no evidence that Dr. Hemphill was trying to deceive the court or the jury.

Contrary to Petitioner's claim that Dr. Hemphill's testimony concerning the manner of Mrs. Launhardt's death was primarily based on unreliable hearsay evidence in the form of Waller's formal statement to police, the medical examiner detailed several reasons to support his conclusion that she was deliberately hung. Even if Dr. Hemphill took Waller's statement into consideration before formulating his opinion, "[t]he Oklahoma Evidence Code places few restrictions on the information an expert may rely upon to form his or her opinions." Lewis v. State, 970 P.2d 1158, 1166 (Okla. Crim. App. 1998). Further, the facts or data relied upon in formulating an expert opinion "need not be admissible in evidence." Id. (citing Okla. Stat. tit. 12, § 2703 (1991)). In any event, Dr. Hemphill specifically stated that he based his opinion on the position of the body, the fact that her hands and ankles were bound, and that she had a ligature around her neck in concluding that someone deliberately committed a homicide. Petitioner has not convinced this Court that he is entitled to habeas relief on this claim.

## V.    Failure to instruct on lesser included offense (ground 5)

In his fifth ground for relief, Petitioner claims that the trial court's failure to instruct the jury on the lesser offense of second degree murder violated his constitutional rights pursuant to Beck v. Alabama, 447 U.S. 625 (1980). He alleges that the trial court unconstitutionally denied instructions on both second degree depraved mind murder and second degree felony murder (Dkt. # 6 at 52-55). Petitioner contends that a second degree murder instruction was warranted as there was evidence that the victim was left alive and Petitioner did not intend to kill her. In response, the Respondent declares that the OCCA's rejection of this claim on direct appeal was not contrary to established federal law as determined by the Supreme Court.

36

The Due Process Clause of the Fourteenth Amendment ensures that "a sentence of death [may not] . . . be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Beck v. Alabama, 447 U.S. 625, 627 (1980). The Supreme Court explained that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense - the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." Gilson v. Sirmons, -- F.3d --, 2008 WL 863034 (10th Cir. 2008) (quoting Beck, 447 U.S. at 637). The Beck requirement is satisfied so long as the jury had the option of at least one lesser included offense. Schad v. Arizona, 501 U.S. 624, 645-46 (1991).

In considering Petitioner's direct appeal challenge to the trial court's failure to instruct on a lesser included offense, the OCCA rejected the claim as follows:

> Appellant's fifth proposition of error asserts that the trial court's failure to issue a second degree "depraved mind" murder instruction resulted in reversible error. Jury instructions on lesser offenses are only appropriate when there is evidence which would reasonably support the finding of the offense. *Crumley v. State*, 815 P.2d 676, 678 (Okl.Cr.1991). Furthermore, this Court has "long held that the giving of instructions on lesser included offenses is within the sound discretion of the trial court. . . ." *Id.* Therefore, absent error, this Court will not intervene. *Id.; Fowler v. State*, 779 P.2d 580, 585 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990). The trial court's failure to give an instruction on second degree murder did not constitute an abuse of discretion. Accordingly, this proposition of error fails.

Richie, 908 P.2d at 276. Although the OCCA cited a standard consistent with Beck, (stating that "Jury instructions on lesser offenses are only appropriate when there is evidence which would reasonable support the finding of the offense") (citing Crumley v. State, 815 P.2d 676 (Okla. Crim. App. 1991)), its subsequent analysis did not follow that standard. Instead, the OCCA chose to

examine whether the trial court abused its discretion. Id. Because the OCCA made no specific finding as to whether sufficient evidence was presented at Petitioner's trial to warrant a second degree depraved mind murder instruction, there is no finding to which this Court owes deference under AEDPA. Accordingly, this Court will consider Petitioner's Beck claim on the merits in the first instance. See Hogan v. Gibson, 197 F.3d 1297, 1306 (10th Cir. 1999). The question before this Court is whether the evidence warranted giving a second degree murder instruction, and whether a jury could have convicted Petitioner of the lesser included offense and acquitted him of first degree murder.

As a threshold issue, the Court must determine whether Petitioner requested a second degree murder instruction. Darks v. Mullin, 327 F.3d 1001, 1008 (10th Cir. 2003). Petitioner cannot prevail on a Beck claim if he failed to request such an instruction at trial. Id. (citing Hogan v. Gibson, 197 F.3d 1297, 1303 n.3 (10th Cir. 1999); Hooks v. Ward, 184 F.3d 1206, 1234 (10th Cir. 1999)). In the case at hand, Petitioner's trial counsel requested three instructions[9] related to second degree depraved mind murder. Counsel also requested a second degree felony murder instruction (O.R. Vol. III at 497), and a manslaughter instruction (Id. at 498). The trial court refused to give any of these instructions to the jury (T. Tr. Vol. III at 678-83). The Court finds that Petitioner has satisfied the threshold inquiry. Accordingly, the Court will proceed to examine the merits of Petitioner's ground five claim.

*Second degree depraved mind instruction*

---

[9] Petitioner's requested instruction No. 9 explained the elements of second degree murder (O.R. Vol. III at 470). His requested instruction No. 10 further defined the element of "imminently dangerous" conduct (Id. at 471). Requested instruction No. 11 further defined conduct which shows a "depraved mind" (Id. at 472).

Under Oklahoma law, second degree murder includes death perpetrated by an act imminently dangerous to the victim and evincing a depraved mind, but without a premeditated design to effect death. See Okla. Stat. tit. 21, § 701.8(1). Further, "[a] design to effect death is inferred from the fact of killing unless the circumstances raise a reasonable doubt whether such design existed." Hammon v. State, 898 P.2d 1287, 1308 (Okla. Crim. App. 1995); Okla. Stat. tit. 21, § 702. Petitioner cites the following evidence in the record to support his position that his actions were imminently dangerous, yet without any design to effect death: (1) medical examiner's testimony that he did not rule out possibility victim was tied and restrained in a sitting or standing position; (2) police testimony that they treated case as a missing person case until body was discovered, inferring that co-defendant had not told them victim was dead and inferring that victim was left alive; (3) crime scene evidence of use of a long strap, absence of a struggle, and presence of a partially consumed prescription for sedative medication; (4) odd manner of death supporting inference that victim was left alive. See Dkt. # 6 at 53. Petitioner argues that, "[T]here is a serious question as to whether Ms. Launhardt was deliberately killed or was instead the victim of some unintended misfortune after being restrained in the closet." Dkt. # 76 at 2.

In response, the Respondent argues that: (1) this is primarily a state law question; (2) a rational jury could not have acquitted on the first degree murder charge so a conviction on a lesser included offense was not possible; and (3) pursuant to the OCCA's decision in Willingham v. State, 947 P.2d 1074, 1080 (Okla. Crim. App. 1997), second degree murder is not a lesser included offense of first degree murder. Respondent's first and third arguments can be disposed of easily. The United States Supreme Court, in Beck and its progeny, has clearly established that in certain circumstances a death sentence may be constitutionally infirm if the jurors were not permitted to consider a lesser

included offense. Further, Respondent's third argument, relying on the OCCA's 1997 <u>Willingham</u> decision, does not apply to Petitioner because at the time of Petitioner's trial and direct appeal, the OCCA considered second degree murder a lesser included offense of first degree murder. <u>See</u> <u>Willingham v. Mullin</u>, 296 F.3d 917, 922-23 (10th Cir. 2002) (citing <u>Hooks v. Ward</u>, 184 F.3d 1206, 1233 n.25 (10th Cir. 1999) (OCCA's <u>Willingham</u> decision post-dated Hooks' trial and was not the law at the time of his trial)).  Having disposed of these two arguments, the Court will focus on Respondent's remaining contention that a rational jury could not have acquitted on the first degree murder charge and could not have found Petitioner guilty of the lesser included offense of second degree depraved mind murder.

Under Oklahoma law, a jury is not required "to consider a lesser offense if no jury could *rationally* find both that the lesser offense was committed and that the greater offense was not." <u>Malicoat v. Mullin</u>, 426 F.3d 1241, 1253 (10th Cir. 2005) (quoting <u>Frederick v. State</u>, 37 P.3d 908, 943-44 (Okla. Crim. App. 2001)); <u>see also</u> <u>Shrum v. State</u>, 991 P.2d 1032, 1034 n.2 (Okla. Crim. App. 1999); <u>Young v. Sirmons</u>, 486 F.3d 655, 670 (10th Cir. 2007). Petitioner was convicted of first degree malice aforethought murder.[10] Accordingly, both the elements of first degree malice aforethought murder and second degree depraved mind murder must be considered in light of the evidence presented at Petitioner's trial. <u>Malicoat</u>, 426 F.3d at 1253. The trial court instructed Petitioner's jury that the elements of first degree malice aforethought murder are: (1) death of a human; (2) death was unlawful; (3) death was caused by the defendant; (3) death was caused with malice aforethought. <u>See</u> O.R. Vol. III at 448. Malice aforethought was further defined as meaning

---

[10] The jury also found Petitioner guilty of felony murder, but the OCCA reversed that conviction on direct appeal because the trial court failed to properly instruct the jury concerning the elements of the underlying felony - kidnaping. <u>Richie</u>, 908 P.2d at 275.

"a deliberate intention to take away the life of a human being."[11] Id. at 449. As noted above, the elements of second degree depraved mind murder are: (1) death of a human; (2) caused by conduct which was imminently dangerous to another person; (3) the conduct was that of the defendant; (4) the conduct evinced a depraved mind in extreme disregard of human life; and (5) the conduct was not done with the intention of taking the life of any particular individual. Taylor v. State, 998 P.2d 1225, 1231 (Okla. Crim. App. 2000), *abrogated on other grounds* Malone v. State, 168 P.3d 185 (Okla. Crim. App. 2007); Okla. Stat. tit. 21, § 701.8(1). The Court must determine if there was trial evidence which tends to negate an element of the first degree murder charge and allow a reduced charge. Malicoat, 426 F.3d at 1253 (quoting Fairchild v. State, 998 P.2d 611, 627 (Okla. Crim. App. 1999) ("Only if there is evidence which tends to negate an element of the First Degree Murder statute, which would reduce the charge, should instructions on a lesser included offense be given.")).

The prosecution's theory at trial was that Mrs. Launhardt was kidnaped, restrained and then lifted up by her feet to effect strangulation from the strap tied around her neck and attached to a closet clothes rod. The defense theory was that Mrs. Launhardt was left in the house restrained, but alive. This is not a case where the evidence "overwhelmingly establishes that this murder was intentional and premeditated." See e.g., Bryson v. Ward, 187 F.3d 1193, 1208 (10th Cir. 1999) (evidence established planning and plotting variety of murder schemes, and several attempts to carry out plans). The state's direct evidence in support of the "malice aforethought" element of first degree murder

---

[11] Instruction number 30 reads in its entirety: "'Malice aforethought' means a deliberate intention to take away the life of a human being. As used in these instructions, 'malice aforethought' does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before commission of the act." O.R. Vol. III at 449.

was glaringly sparse. In fact, as noted by the Tenth Circuit, the prosecution presented no direct evidence establishing the manner of Mrs. Launhardt's death. Richie, 417 F.3d at 1123. However, a jury can find intent, including malice aforethought, from circumstantial evidence. See Holland v. United States, 348 U.S. 121, 140 (1954). The state solicited testimony from the medical examiner, Dr. Hemphill, that the medical evidence was consistent with the state's theory. Dr. Hemphill's testimony on direct examination, however, was "hardly absolute" (Richie, 417 F.3d at 1123) when he stated that, "[I]t's *my opinion* that suspension or partial suspension as in hanging *probably* played a major part in the mechanism, that is putting enough pressure from this ligature on the blood vessels of the neck to cause asphyxiation." T. Tr. Vol. II at 561 (emphasis added). Although he opined that the victim's death was a homicide, Dr. Hemphill acknowledged that:

> Beyond that there's not a whole lot more that I can say. I don't know how many people were involved. I don't have any evidence to indicate that. I don't know exactly what the person did. In what sequence and what he might have said or anything else.

Id. at 566. In support of its theory that Petitioner caused Mrs. Launhardt's death through deliberate hanging, the prosecution also relied upon photographs of the crime scene and the testimony of Tulsa police Officer Heim regarding the position of the body and the victim's dress at the time her body was discovered.

A review of the record discloses, however, that the jury was also presented with evidence which tended to negate the element of malice aforethought. On cross-examination, Dr. Hemphill conceded that the medical evidence was not inconsistent with Mrs. Launhardt being tied and restrained in the closet in a standing or sitting position (T. Tr. Vol. II at 586). On cross-examination, Tulsa Police Officer Heim testified that as detectives were driving to the crime scene at the direction of Petitioner's accomplice, Daniel Waller, they continued to work the case as a missing person case,

rather than a homicide (T. Tr. Vol. II at 535-36). Arguably, this testimony supported the defense

theory that the victim was left alive or Mr. Waller would have told the police that she had been killed.

On cross-examination, Tulsa Police Corporal Gary Meek testified as follows:

> Q:      You went into the closet; is that correct?
>
> A:      That's correct.
>
> Q:      Did you examine the cord extended from the closet rod?
>
> A:      Just visually looked at it.
>
> Q:      Did you closely examine it at all?
>
> A:      No, ma'am.
>
> Q:      The position of the body as you found it and the cord, would it be fair to say that as you saw it tied that this could have been a method to restrain someone? Tied around the closet rod and around the neck, that could have been a method to restrain someone?
>
> A:      Sure it could.
>
> Q:      Okay. And from the position of the body as you saw it and the cord, could you also say that the evidence is consistent with restraining someone and leaving them there either in a standing or sitting position?
>
> A:      I would say that the cord is long enough to accomplish that goal.

T. Tr. Vol. II at 514. Finally, the defense presented the testimony of Dr. Bernard Greenburg, a

forensic entomologist whose expertise was in determining a time of death based upon the activity,

size and developmental stage of maggots and flies around a body. See T. Tr. Vol. III at 620-65. Dr.

Greenburg testified that, in his opinion, it was most probable Mrs. Launhardt died on August 30th,

and less probable that she died on the 29th.  He found it least probable that she died on the 28th,

which was the day the prosecution claims she was deliberately killed by Petitioner (id. at 638-39).

This Court finds that the evidence introduced in support of Petitioner's theory that he did not intend to kill Mrs. Launhardt presented an alternative version of events to the jury which could negate the intent element of first degree murder. Further, a jury could rationally conclude that Mrs. Launhardt's death was perpetrated by an act imminently dangerous to the victim and evincing a depraved mind, but without a premeditated design to effect death. Petitioner has demonstrated that, "[T]he evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first-degree murder." Young v. Sirmons, 486 F.3d 655, 670 (10th Cir. 2007) (citing Hogan v. Gibson, 197 F.3d 1297, 1307 (10th Cir. 1999). Thus, because Petitioner was entitled to but did not receive instructions on second degree depraved mind murder, he is entitled to habeas relief on this portion of his ground five claim.

*Second degree felony murder instruction*

As a part of his fifth claim for relief Petitioner also argues that he was constitutionally entitled to an instruction on second degree felony murder (Dkt. # 6 at 53-4). Respondent offers no argument to the second degree felony murder instruction issue in his response (Dkt. # 7).  Notably, neither party correctly analyzes the exhaustion status of this claim. Petitioner makes no mention of exhaustion, and Respondent states that Petitioner's ground five claim "was raised on direct appeal and addressed on the merits by the OCCA." See Dkt. # 7 at 26. However, Respondent appears to be addressing only the portion of the ground five issues related to the failure of the trial court to give an instruction on second degree depraved mind murder. Id. The record reflects that Petitioner did not question the failure of the trial court to give a second degree felony murder instruction in his direct appeal proceedings (Brief of Appellant, OCCA Case No. F-93-1095). He did, however, include this claim

in the arguments supporting Proposition III[12] of his application for post-conviction relief. The OCCA found the issue to be "barred by *res judicata* and/or waived" because it could have been raised on direct appeal, but was not. <u>Richie v. Oklahoma</u>, 957 P.2d 1192, 1195-96 (Okla. Crim. App. 1998). The OCCA's procedural bar is an "independent" state ground because Petitioner's failure to comply with state procedures "was the exclusive basis for the state court's holding." <u>Maes v. Thomas</u>, 46 F.3d 979, 985 (10th Cir. 1995). The Court also finds that the bar imposed by the OCCA on this claim is based on state law grounds adequate to preclude federal review. See <u>Cannon v. Gibson</u>, 259 F.3d 1253, 1269 (10th Cir. 2001).

Under the procedural default doctrine, this Court may not consider Petitioner's claim regarding the trial court's failure to give a second degree felony murder instruction unless Petitioner is able to show cause and prejudice for the procedural default, or demonstrate that a fundamental miscarriage of justice would result if his claim is not considered. See <u>Coleman</u>, 501 U.S. at 750. Petitioner does not attempt to show cause and prejudice for his failure to present this issue on direct appeal. Nor does he argue that a fundamental miscarriage of justice would occur if this claim is not considered.

Therefore, because Petitioner has not demonstrated "cause and prejudice" or that a "fundamental miscarriage of justice" will result, the Court concludes that it is procedurally barred from considering the merits of Petitioner's ground five claim relating to the omission of a second degree felony murder instruction. <u>Coleman</u>, 501 U.S. at 724.

---

[12] Proposition III:  This Court erred in upholding Mr. Richie's first degree malice aforethought murder conviction in light of the fundamental errors created by the reversal of the felony murder conviction due to jurisdictional problems. <u>See</u> Petitioner's Application for Post-Conviction Relief in OCCA Case No. PC-96-1556 at 17, and Addendum Vol. 1 at 24-25.

## VI.     Ineffective assistance of trial counsel[13] (ground 6)

In his sixth ground for relief, Petitioner claims that his trial attorney was ineffective because of failure to properly present a defense based upon Petitioner's alleged voluntary intoxication at the time of the murder. More specifically, he argues that his counsel failed to investigate, prepare and present a defense based on voluntary intoxication, and failed to request a jury instruction relating to the law of voluntary intoxication. He also alleges that his trial attorney was constitutionally ineffective for failing to develop and present evidence of Richie's psychological impairment in both the guilt and punishment stages of trial. These claims were raised in Proposition I of Petitioner's post-conviction proceedings, and rejected by the OCCA on procedural bar grounds. Richie 957 P.2d at 1196. This Court has previously determined that the State's imposition of a procedural bar on his ground six claims is not adequate to preclude federal review (Dkt. # 55). Petitioner was granted an evidentiary hearing to present evidence in support of the ineffective assistance of counsel claims in ground six (Dkt. # 15). Accordingly, the Court will examine the merits of Petitioner's claims presented in this ground.

To prevail on his claims of ineffective assistance of counsel, Richie must demonstrate that counsel's performance fell below an objective standard of reasonableness and was so prejudicial that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

### *Voluntary intoxication*

Although Petitioner assertively claims he was intoxicated at the time of the murder, there is

---

[13] The two claims of ineffective assistance of counsel presented in ground six are also included in Petitioner's ground ten claims. The Court has considered the arguments and authorities presented by both parties in ground ten in its resolution of the ground six claims.

no evidence in the trial record to support his assertion.[14] As noted by Respondent, Petitioner has not shown who his trial attorney should have investigated or presented to testify about Richie's alleged intoxication. Nor has Petitioner advised what specific information could have been uncovered to demonstrate to the jury that he was incapable of forming the intent to kill due to his intoxication. In Oklahoma, a *prima facie* showing that meets the legal criteria for the defense of voluntary intoxication requires that a defendant demonstrate that he was "so utterly intoxicated that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." Jackson v. State, 964 P.2d 875, 892 (Okla. Crim. App. 1998). Petitioner does not point to any evidence or testimony at trial regarding his intoxication. Nor did Petitioner present any evidence at the evidentiary hearing regarding his drug or alcohol use on the day of the murder.

Several witnesses at trial testified that they had seen or talked to Petitioner on August 28, 1991. Dana Daugherty testified that she saw Petitioner in the parking lot of the K-Mart on the morning of August 28th, and that he spoke briefly to her about her daughter. T. Tr. Vol. II at 378-80. Sondra Wong also testified that she encountered Richie and Waller in the parking lot of the K-Mart on August 28th. Id. at 380-91. Neither of these witnesses indicated that Petitioner appeared intoxicated. Clyde Huffines stated that he had talked to Petitioner in an oil field in the early afternoon of August 28, 1991. Mr. Huffines testified that he had a conversation with both Richie and with Mrs.

---

[14] Petitioner refers to a November 26, 1996, affidavit of co-defendant Daniel Paul Waller to support his claim that he had stayed up all night the night before Mrs. Launhardt disappeared, he drank large quantities of hard liquor and beer, smoked marijuana, and took several "Black Mollies." See Dkt. # 6 at 56-7, citing affidavit tendered in post-conviction proceedings in Vol. II, App. 27. Mr. Waller did not testify at Petitioner's trial. He did testify at the August 11, 2003, evidentiary hearing that his statements in the affidavit were true and correct. Ev. Hr'g Tr. at 122.

Launhardt, but he did not indicate that Richie appeared intoxicated. Id. at 398-406. Sheila Martin, a motel owner from Muskogee, testified that Petitioner, representing himself as "Mark Allen" checked into the Catalina Motel around 6:30 p.m. on August 28th, together with a young boy. Petitioner conversed with Ms. Martin, filled out the required registration forms, and paid for three nights in cash. Again, no testimony was given to indicate that Petitioner appeared to be intoxicated. Id. at 420-24. Bonnie Ready, a convenience store clerk in Muskogee, also came into contact with Petitioner late in the evening of August 28th, but did not testify that he appeared intoxicated or impaired in any way. Id. at 425-28. Although Petitioner now claims that his counsel "never explored" an intoxication defense, it is unclear who trial counsel could have presented to testify that Richie was intoxicated to the degree necessary to negate intent as required by Oklahoma law in Jackson, 964 P.2d at 892. Because Petitioner has failed to demonstrate that his trial attorney's representation was deficient under the Strickland standard, the Court need not address the prejudice prong of such standard. Petitioner is not entitled to habeas corpus relief on this portion of his ground six claim.

### Evidence of psychological impairment

Petitioner also argues that his trial counsel's representation was constitutionally deficient because she failed to develop and present neuropsychological evidence that would have aided in first stage defense and second stage punishment stage. His trial counsel testified at the August 11, 2003, evidentiary hearing that obtaining the services of a neuropsychologist is fundamental in defending capital cases. Ev. Hr'g Tr. at 39. Prior to post-conviction proceedings, Petitioner was not evaluated by a neuropsychologist expert qualified to ascertain whether he suffered from neurological or other deficits that would mitigate his moral culpability.

> "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting

mitigating evidence." Romano v. Gibson, 239 F.3d 1156, 1180 (10th Cir. 2001). To perform adequately in a capital case, trial counsel must undertake "'to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989) [hereinafter 1989 Guidelines] ); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7(A) (2003) [hereinafter 2003 Guidelines]. Counsel should consider, *inter alia*, medical history, educational history, social and family history, religious and cultural influences, and employment. *See* 2003 Guidelines 10.7, Commentary.

Anderson v. Sirmons, 476 F.3d 1131, 1142 (10th Cir. 2007).  Petitioner contends that, by failing to

engage the services of a neuropsychologist, his trial counsel did not adequately rebut the second stage

case in aggravation. Further, trial counsel's failure to investigate and present mitigation evidence in

the form of expert testimony regarding Petitioner's mental state amounted to constitutionally

deficient performance. This Court agrees.

Second stage defense witnesses included the following:

Jerry Malcom Hess - Petitioner's older brother, Jerry Hess, testified that alcoholism runs in his family; that he helped raise and discipline Petitioner; and that they moved around frequently. T. Tr. Vol. III at 784-94.

Eddy Lewis Hess - Petitioner's oldest brother, Eddy Hess, also testified about alcohol abuse in the Richie home; tremendous amount of verbal abuse; physical abuse from step-father Gary Eastridge. He also stated that the siblings tried to take care of one another, and the older ones fed, clothed, and tried to protect the younger children. Petitioner was one of the younger ones. Id. at 794-807.

Jeanette Eastridge - Petitioner's mother, Jeanette Eastridge, testified that Petitioner was one of six children; that they moved around frequently; that Petitioner was a "sweet kid"; that her husband, Gary Eastridge was a "cruel human being" and put a shotgun to her head once, in addition to frequent beatings; that Petitioner was often withdrawn but got into trouble by running with the wrong group of kids; that she cares about Petitioner; that she knows he had a drug problem and some prior convictions. Id. at 810-27.

James Richie - One of Petitioner's brothers, James Richie, testified that his parents were alcoholics; that he and Petitioner basically raised themselves in a slum area called Baldwin Park in Arizona. He also testified about an incident when he and Petitioner were in a fight

with some other people which resulted in Petitioner being hospitalized with stab wounds. Id. at 828-36.

Debbie Partridge - One of Petitioner's older sisters, Debbie Partridge, testified about her relationship with Petitioner as an adult and how he cared for her children and was "real good with them." On cross-examination, Ms. Partridge admitted that she knew about Petitioner's drug problems and prior problems with the law. Id. at 836-44.

Heather Partridge - Petitioner's niece, Heather Partridge, testified that Petitioner always took good care of her when she was a child and that he was her favorite uncle. Id. at 844-47.

Dawn Partridge - Petitioner's niece and sister to Heather, Dawn Partridge also testified that Petitioner took care of her as a child and that there was rampant alcoholism among the adults in the family. Id. at 847-53.

Tammy Richie - Another of Petitioner's sisters, Tammy Richie, echoed the testimony of her siblings regarding family life, alcoholism, etc. Id. at 853-61.

Consisting solely of testimony from family members, the thrust of Petitioner's mitigation defense focused on Petitioner's family history. Some of the family members touched briefly upon Petitioner's social and educational background. However, other than the mention of one hospitalization, there was no testimony regarding Petitioner's medical history, religious and cultural influences, or employment history. Notably, there was no testimony from a medical expert concerning Petitioner's mental state and mental abilities. Based upon the evidentiary hearing testimony of medical expert, Dr. Dale G. Watson, this Court finds that there is a reasonable probability that, but for counsel's failure to present such expert testimony, the result of the sentencing proceeding would have been different. See Strickland, 466 U.S. at 694. Omission of mental health evidence from Petitioner's case for mitigation was unreasonable, and resulted in prejudice to Petitioner.

The Tenth Circuit Court of Appeals has noted that mitigating evidence of this sort is "exactly the sort of evidence that garners the most sympathy from jurors." Smith v. Mullin, 379 F.3d 919, 942

(10th Cir. 2004). The Circuit Court explained:

> Clearly, evidence of Mr. Smith's mental retardation, brain damage, and troubled background constituted mitigating evidence. The Supreme Court has, time and again, cited "the standards for capital defense work articulated by the American Bar Association (ABA) ... as 'guides to determining what is reasonable'" performance. Wiggins, 123 S.Ct. at 2536-37 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052; Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Those standards repeatedly reference mental health evidence, describing it as "of vital importance to the jury's decision at the punishment phase." *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 1.1, 4.1, 10.4, 10.7, 10.11. It was patently unreasonable for Mr. Watson to omit this evidence from his case for mitigation. Mr. Smith has thus cleared Strickland's first hurdle.

Id. Further relying on testimony presented at Smith's evidentiary hearing, the Circuit Court noted:

> Death penalty litigation expert Dr. Craig Haney testified at the evidentiary hearing that "[j]uries respond to and find mitigating [this type of evidence,] and [they] are more likely to vote for life rather than death sentences in cases where there is ... clear and clearly presented evidence that the defendant has suffered from some form of mental illness...." E.H., vol. X, at 479-80. The available empirical evidence as to juror attitudes supports Dr. Haney's conclusions. *See* Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?, 98 Colum. L.Rev.. 1538, 1559 (1998) (finding evidence of mental retardation and mental illness to be the most persuasive mitigation evidence and to have practically no aggravating effect); Samuel P. Gross, Update: American Public Opinion on the Death Penalty-It's Getting Personal, 83 Cornell L.Rev. 1448, 1468-69 (1998) (finding mental retardation to be "much more" mitigating than other potential factors). *See also* Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir. 1996) (citing empirical evidence of juror sympathy to claims of "organic brain problems"); Brewer v. Aiken, 935 F.2d 850, 862 (7th Cir. 1991) (Easterbrook, J., concurring) (same).

Id. Petitioner's litigation expert, David Autry, also agreed that a neuropsychologist's testimony that a person has some type of organic brain damage provides a very significant mitigating factor and is "helpful because it gives the jury an explanation that it's something outside of the defendant, something that is not his fault, that he's a damaged person." Ev. Hr'g Tr. at 187. Mitigation evidence "affords an opportunity to humanize and explain." Romano, 239 F.3d at 1180 (quoting Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir. 2000)). The Court must insure that Petitioner's jury was

equipped with the "fullest information possible concerning the defendant's life and characteristics," and "must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." Id. (citing Lockett v. Ohio, 438 U.S. 586, 603 (1978); Williams v. New York, 337 U.S. 241, 247 (1949)).

In Petitioner's case, Dr. Watson's testimony could have provided the jury with an explanation for Petitioner's behavior. During the evidentiary hearing, Dr. Watson, a licensed psychologist specializing in the area of neuropsychology,[15] provided substantial testimony about Petitioner's mental disabilities. Ev. Hr'g Tr. at 87. At the request of Petitioner's post-conviction counsel Dr. Watson had conducted a comprehensive battery of neuropsychological tests on Mr. Richie. The testing was done over a 14 hour period on November 13 and 14, 1996, at the Oklahoma State Penitentiary in McAlester. See Ev. Hr'g Tr., Petitioner's Ex.# 11 at 1. Dr. Watson testified that, based upon the results of these tests, Petitioner has "moderate[16] neurocognitive or neuropsychological dysfunction, evidence of brain dysfunction." Id. at 89. He also observed that Petitioner had a history of significant alcohol and marijuana dependency, in remission due to his incarceration. Id. at 91. In his report, Dr. Watson concluded that Richie's comprehensive neuropsychological evaluation "provided consistent, clear and substantial evidence of brain dysfunction." Ev. Hr'g Tr., Petitioner's Ex.# 11 at 19. Further, the evaluation revealed "striking signs of lateralized sensory and motor

---

[15] According to Dr. Watson, "Neuropsychology is the study of brain and behavior relationships. So a neuropsychologist will use tests, paper and pencil tests, puzzles, games, things like that in order to understand how and to infer the status of the brain in terms of whether there's brain damage or whether it's functioning normally." Ev. Hr'g Tr. at 87.

[16] Dr. Watson explained that there are four levels of dysfunction: no problem, mild, moderate, and severe. Individuals in the severe range of impairment would probably be unable to function very independently. Ev. Hr'g Tr. at 90.

impairments indicative of brain damage." Id. Dr. Watson observed classic signs of "lateralized brain damage." Id. He also concluded that Petitioner had limited intellectual capacity. Ev. Hr'g Tr. at 91.

Without opining as to the specific cause of Petitioner's brain damage, Dr Watson noted that Richie has suffered a series of head injuries. At age 13 his head struck a curb in a motorcycle crash. He was hit by car while riding his bike at age 15. At age 14 or 15 he fell out of the trunk of a car and was knocked unconscious. At age 16 or 17 he was attacked, beaten with an iron bar and stabbed, again causing him to become unconscious. Id. Richie also has a long history of severe headaches. Id.

Nothing in the record indicates that trial counsel's failure to investigate and obtain a neurological expert was a strategic decision. Counsel simply did not take any action to determine whether such evidence was available. Dr. Eugene Reynolds, psychologist, had examined Petitioner prior to trial, but trial counsel testified that she did not call him as a witness because he did not have "anything that was of benefit to our mitigation." Ev. Hr'g Tr. at 74. Dr. Reynolds' evaluation was based on personality tests, rather than neuropsychological tests which are designed to detect brain damage. Id. at 94-5.  The Court concludes that counsel's failure to investigate and present an adequate mitigation case during the penalty phase of Petitioner's was trial was constitutionally deficient under Strickland. The Court also finds that Petitioner was prejudiced by this deficiency. In evaluating prejudice, the Court has considered the strength of the state's case and the aggravating factors found by the jury as well as the mitigating evidence that might have been presented through an expert such as Dr. Watson. See Castro v. Ward, 138 F.3d 810, 832 (10th Cir. 1998).  Because there is a reasonable probability that the sentencing jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death, the Court concludes that Petitioner is entitled to habeas relief on this issue and is entitled to a new trial for second stage sentencing

proceedings.

## VII.   Insufficient evidence for murder conviction (ground 7)

As his seventh proposition of error, Petitioner challenges the sufficiency of the evidence supporting his conviction of first degree malice murder. He complains that his conviction was based upon circumstantial evidence and cannot stand, under Oklahoma law, unless the evidence is inconsistent with any reasonable hypothesis other than guilt. See Dkt. # 6 at 62. Further, the evidence presented was "not inconsistent with the reasonable hypothesis Mrs. Launhardt was restrained but alive when Waller and Mr. Richie departed." Id. at 64. In resolving Petitioner's challenge to the circumstantial nature of the evidence on direct appeal, the OCCA cited Berry v. State, 834 P.2d 1002, 1003 (Okla. Crim. App. 1992), and found that "the evidence effectively precluded every reasonable hypotheses except that of guilt with respect to each of appellant's convictions." Richie, 908 P.2d at 276.

As stated above, a writ of habeas corpus will not be issued on a state claim adjudicated on the merits unless the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," Id. at § 2254(d)(2). "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Tenth Circuit authority remains unsettled as to "whether a challenge to the sufficiency of the evidence on a habeas petition is a question of fact or a question of law, and therefore whether 28 U.S.C. § 2254(d)(1) or § 2254(d)(2) should apply." Hamilton v. Mullin, 436 F.3d 1181, 1194 (10th Cir. 2006). Under either standard, Petitioner's claim in this case fails.

In examining Petitioner's sufficiency of the evidence claim, the appropriate inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  In evaluating the evidence presented at trial, the Court does not weigh conflicting evidence or consider witness credibility. Wingfield v. Massie, 122 F.3d 1329, 1332 (10th Cir. 1997); Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996).  Instead, the Court must view the evidence in the "light most favorable to the prosecution," Jackson, 443 U.S. at 319, and "accept the jury's resolution of the evidence as long as it is within the bounds of reason." Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993).  The standard reflects the "longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial." Turrentine v. Mullin, 390 F.3d 1181, 1197 (10th Cir. 2004).

Under the AEDPA, the Court must decide whether the OCCA's decision that there was sufficient evidence to support a jury's finding of guilt was contrary to or an unreasonable application of Jackson. See 28 U.S.C. § 2254(d)(1); Spears v. Mullin, 343 F.3d 1215, 1238-39 (10th Cir. 2003). The Court must consider all the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn from it. See United States v. Hager, 969 F.2d 883, 887 (10th Cir.1992) (citing United States v. Hooks, 780 F.2d 1526, 1531 (10th Cir. 1986), *abrogated on other grounds by* Bailey v. United States, 516 U.S. 137 (1995)). The evidence "must be substantial; that is, it must do more than raise a mere suspicion of guilt." Beachum v. Tansy, 903 F.2d 1321, 1332 (10th Cir. 1990). Circumstantial evidence alone may be sufficient to support a conviction. See Hager, 969 F.2d at 888. The circumstantial evidence required to support a verdict need not exclude every reasonable hypothesis other than guilt. Id. (citing United States v. Alonso, 790 F.2d 1489, 1493 (10th Cir.1986)).

55

It "must only reasonably support the jury's finding of guilt beyond a reasonable doubt." Id. (quoting United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir.1991)). A conviction may not be sustained if it resulted only "from piling inference on top of inference" from the evidence. See United States v. Horn, 946 F.2d 738, 741 (10th Cir.1991) (citing Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943)). All reasonable inferences and credibility choices are made in favor of the jury's verdict. United States v. Massey, 687 F.2d 1348, 1354 (10th Cir.1982). A jury has the discretion to accept or reject whatever evidence it chooses. Hager, 969 F.2d at 888. The credibility of a witness and weight of his testimony are for the jury alone. Id. (citing United States v. Leach, 749 F.2d 592, 600 (10th Cir.1984)).

In resolving Petitioner's challenge to the sufficiency of the evidence on direct appeal, the OCCA applied a state-law standard of review, considering whether the evidence "tends to exclude every reasonable hypothesis [other] than guilt." Richie, 908 P.2d at 276.  The standard used by the OCCA is actually more onerous that the Jackson standard.  See Romano v. Gibson, 239 F.3d 1156, 1164 (10th Cir. 2001). "Thus, if the evidence was sufficient to meet Oklahoma's stricter test, it would certainly also meet the Jackson standard."  Id.

This Court looks to Oklahoma law for the substantive elements of first degree malice murder applicable to the sufficiency of the evidence standard. See, e.g., Spears v. Mullin, 343 F.3d 1215, 1238 (10th Cir. 2003); see also Jackson, 443 U.S. at 324 n. 16. Under Oklahoma law, "[a] person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." Okla. Stat. tit. 21, § 701.7A.

56

Petitioner challenges the sufficiency of the largely circumstantial case underlying his conviction. Because of the circumstantial nature of the evidence, the OCCA applied its stringent standard of review to consider whether the evidence was inconsistent with any reasonable hypothesis other than guilt. The evidence established the following: Richie and Waller were seen with Mrs. Launhardt during the afternoon of August 28, 1991. Mrs. Launhardt's credit cards and ATM card were used by Richie and Waller later in the day on August 28. Richie was found in possession of Mrs. Launhardt's van several days later. Waller led police to the abandoned house where Mrs. Launhardt had been restrained. With restraints still intact, Mrs. Launhardt's body was found at the abandoned house. Although the time and manner of Mrs. Launhardt's death were critical in determining whether Petitioner committed first degree murder, the state presented evidence through the testimony of the medical examiner that the cause of death was asphyxiation by ligature. The medical examiner also estimated the time of death at approximately seventy-two hours before the discovery of the body on September 1, 1991. Considered in the light most favorable to the state, see Jackson, 443 U.S. at 319, this evidence was sufficient for a rational trier of fact to find the existence of all the elements of first degree malice murder beyond a reasonable doubt. The Court specifically rejects any argument by Petitioner that he is entitled to habeas corpus relief because he can posit other reasonable theories consistent with the circumstantial evidence presented during his trial and for that reason, the evidence was insufficient to support his conviction. The circumstantial evidence required to support a verdict "must only reasonably support the jury's finding of guilt beyond a reasonable doubt." Hager, 969 F.2d at 888 (quoting United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir. 1991)). The Court concludes that the evidence presented at Petitioner's trial was sufficient to sustain Petitioner's conviction of first degree murder. Therefore, Petitioner has failed to satisfy the

57

§ 2254(d) standard and his request for habeas corpus relief based on a challenge to the sufficiency of the evidence for the conviction shall be denied.

## VIII.   Insufficient evidence for kidnaping and robbery convictions (ground 8)

Petitioner next claims that the circumstantial evidence presented at his trial was constitutionally insufficient to support his kidnaping for extortion and robbery with a firearm convictions (Dkt. # 6 at 66). The OCCA reviewed this issue on direct appeal in conjunction with the claim raised by Petitioner in ground seven above, and denied relief. Richie, 908 P.2d at 276. Respondent contends that the OCCA's decision was not contrary to federal law or an unreasonable determination of the facts (Dkt. # 7 at 47).

As noted above, sufficiency of the evidence on a habeas issue must be examined both as a question of law and a question of fact. Maynard v. Boone, 468 F.3d 665, 673 (10th Cir. 2006). This Court must analyze whether the facts are correct and whether the law was properly applied to the facts. The factual determinations by the OCCA are presumed correct, see 28 U.S.C. § 2254(e), unless rebutted by clear and convincing evidence presented by Petitioner. The Court must consider whether the OCCA's conclusion that the evidence was sufficient to support convictions for kidnaping and robbery constituted an unreasonable application of the Jackson standard.  Whether the evidence is sufficient depends on what the state is required to prove. Diestel v. Hines, 506 F.3d 1249, 1267 (10th Cir. 2007) (citing Jackson, 443 U.S. at 324 n.16).

Under Oklahoma law in effect at the time of Petitioner's crime, the elements of kidnaping for extortion are : (1) unlawful; (2) forcible seizure and confinement; (3) of another; (4) for the purpose of extorting money, property or other items of value. Okla. Stat. tit. 21, § 745A; see also O.R. Vol. III at 441, Instruction No. 22. The evidence at trial revealed that Richie, Waller and the victim were

58

all seen at the K-mart store on August 28th, and were seen together again in a field not far from where her body was later found. The evidence was also uncontroverted that Richie and Waller had used Mrs. Launhardt's credit cards and debit card in the following days. Finally, the victim's van was in Petitioner's possession when he was apprehended. This Court finds that after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of kidnaping for extortion beyond a reasonable doubt. See Jackson, 443 U.S. at 319. The OCCA's ruling on this issue was not an unreasonable determination of the facts nor was it an unreasonable application of Supreme Court law.

Likewise, the Court finds that a rational juror could have found the essential elements of robbery with a firearm.[17] Although less probative than the evidence supporting the kidnaping by extortion conviction, the evidence supporting Petitioner's robbery by firearm conviction was sufficient for a rational juror to conclude the elements were satisfied. Mrs. Launhardt's van, credit cards, and ATM card were taken from her. A handgun belonging to Petitioner was located in a pawn shop in New Orleans, shortly after he was arrested there. (T. Tr. Vol. II at 504). Further, the witness who saw Petitioner, Waller, and the victim in a field, testified that he observed Petitioner retrieving something from the vehicle and placing it in his pants behind his back. A reasonable juror could have inferred that the item was a gun. Upon viewing the evidence in the light most favorable to the prosecution, this Court cannot find that the OCCA's decision was an unreasonable determination of the facts or an unreasonable application of Supreme Court law. Petitioner is not entitled to habeas

---

[17] The elements set out for Petitioner's jury were: (1) wrongful; (2) taking; (3) carrying away; (4) personal property; (5) of another; (6) from the immediate presence of another; (7) by fear; (8) through use of a firearm (handgun). O.R. Vol. III at 443, Instruction No. 24. See also Okla. Stat. tit. 21, § 801.

relief on this claim.

## IX.      Improper venue (ground 9)

Petitioner contends in his ninth proposition of error that his constitutional rights to due process were violated because his trial was improperly held in Tulsa County. He claims that Tulsa County District Court did not have jurisdiction to adjudicate the charges against him because the crimes occurred in Pawnee County.

Oklahoma permits the prosecution of an accused for all offenses with which he is charged in a county in which any of the offenses were committed if they were all part of a single criminal episode. On direct appeal, the OCCA found as follows:

> Under the facts of the instant case, where the victim is kidnaped in one county and subsequently murdered in another county, we find that venue is proper in both of the counties. *See Shelton v. State*, 793 P.2d 866, 871 (Okl. Cr. 1990). In reaching a decision, the *Shelton* Court relied upon 22 O.S. 1981, § 124 as authority. Title 22 O.S. 1991, § 124 provides:
>
>> When a public offense is committed, partly in one county and partly in another county, or the acts or effects thereof, constituting or requisite to the offense, occur in two or more counties, the jurisdiction is in either county.
>
> In the instant case, the murder offense was preceded by the offense of kidnapping. We find the murder can neither be considered in isolation, nor as factually distinct from the antecedent kidnapping. The prosecution of appellant in Tulsa County for kidnapping and murder was not barred merely because the murder may have occurred in Pawnee County. "When a crime is committed in more than one county, as it was here, venue is proper in either county at the State's discretion." *Hawkins v. State*, 891 P.2d 586, 593 (Okl. Cr. 1994). Finding no error, this proposition fails.

Richie, 908 P.2d at 274.  A federal court is not free to issue a writ of habeas corpus "on the basis of a perceived error of state law." Pulley v. Harris, 456 U.S. 37, 41 (1984). Thus, a claim of a federal constitutional violation that is based on an alleged misapplication of Oklahoma's laws regarding jurisdiction and venue cannot be sustained. The application of its jurisdiction and venue laws to a

60

given set of facts is a matter to be resolved by Oklahoma courts. Thus, Petitioner's claim regarding the question of the trial court's jurisdiction based upon alleged improper venue is a matter of state law which is not cognizable in a habeas corpus proceeding.

## X.      Ineffective assistance of trial counsel (ground 10)

In ground ten, Petitioner lists further instances of alleged ineffective assistance of trial counsel. More specifically he claims his trial counsel was ineffective in the following ways: (1) failure to develop the theory of defense through experts; (2) failure to develop diminished capacity defense; (3) failure to investigate Richie's mental health; (4) failure to request change of venue; and (5)  failure to insist on the exclusion of Christy Windel's testimony. See Dkt. # 6 at 76-94.  These claims were raised in Petitioner's application for post-conviction relief. The OCCA decided they were procedurally barred as the claims could have been raised on direct appeal. As noted earlier, this Court previously found that the procedural bar was inadequate to bar federal review and granted Petitioner's request for an evidentiary hearing on his ground ten claims, among others (Dkt. #15). The first two claims have been addressed by this Court in the sections discussing grounds two, three and six. Petitioner presents no new argument or authorities in ground ten supporting his first two claims of ineffective assistance of counsel for failing to develop the defense theory through experts and failing to develop a voluntary intoxication defense. Accordingly, no further examination of those issues shall be undertaken by this Court. An analysis of the merits of each of the remaining three claims follows. In order to obtain relief, Petitioner must demonstrate that his counsel's performance was deficient, and that he was prejudiced by the deficient performance. Strickland, 466 U.S. at 684.

*Failure to investigate Richie's mental health*

Petitioner alleges that his constitutional right to an effective trial counsel was violated because

61

she did not investigate or raise questions regarding his competency to stand trial. "A criminal defendant [cannot] be tried unless he is competent." <u>Maynard v. Boone</u>, 468 F.3d 665, 672 (10th Cir. 2006) (quoting <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993)).

> The law of competency is well-settled. "[T]he criminal trial of an incompetent defendant violates due process. This prohibition is fundamental to an adversary system of justice." <u>McGregor v. Gibson</u>, 248 F.3d 946, 951 (10th Cir. 2001) (quotations and citation omitted). The test for determining competency to stand trial is this: "[t]he trier of fact must consider 'whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him.'" <u>Id.</u> at 952 (quoting <u>Dusky v. United States</u>, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)).

<u>Allen v. Mullin</u>, 368 F.3d 1220, 1238-39 (10th Cir. 2004). In support of his contention that his trial attorney should have investigated his mental competency, Petitioner directs the Court's attention to an affidavit of previous trial counsel, an affidavit of trial counsel, records from Petitioner's May, 1991, incarceration in the Rogers County Jail, Petitioner's demeanor and lack of emotion during trial, affidavits of post-conviction counsel regarding Petitioner's mental state at Oklahoma State Penitentiary following his conviction, and Dr. Watson's evaluation of Petitioner's brain dysfunction. None of this evidence shows Petitioner was incompetent to stand trial, nor does it raise any legitimate doubt about Petitioner's competency to stand trial. Petitioner has not established that he did not have the ability to consult with his trial lawyer or that he did not understand the proceedings against him. Lacking evidence which questions Petitioner's competency to stand trial, the Court cannot find any basis for finding that his trial counsel was deficient for failing to present an incompetency claim.

<em>Failure to request change of venue</em>

Petitioner next claims that his trial counsel was ineffective because she did not request a change of venue based on pretrial publicity. To establish ineffective assistance in failure to move for

62

a change of venue due to prejudicial pretrial publicity, Petitioner must show at a minimum that the trial court would have or should have granted a change of venue motion. This, in turn, requires him to show actual or presumed prejudice on the part of jurors. Hale v. Gibson, 227 F.3d 1298, 1332 (10th Cir. 2000). Actual prejudice requires showing that one or more jurors believed before trial that petitioner was guilty and that they could not set these pre-formed opinions aside at trial. Id. Presumed prejudice requires showing that "an irrepressibly hostile attitude pervaded the community." Id. (quoting Stafford v. Saffle, 34 F.3d 1557, 1567 (10th Cir. 1994)). Petitioner does not allege actual prejudice, and his allegations of presumed prejudice, based on pretrial newspaper articles and the "influence of news media," (Dkt. # 6 at 88), do not approach the high standard necessary to warrant a change in venue. See Hale, 227 F.3d at 1332 ("Simply showing that all the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community."). Petitioner has not demonstrated that his counsel's performance was deficient for failing to request a change of venue. He is not entitled to habeas relief on this claim.

*Failure to insist on exclusion of Christy Windel's testimony*

In this part of his ground ten claim, Petitioner asserts that his trial counsel provided ineffective assistance by failing to raise the issue of marital privilege to prevent testimony from Christy Windel, a.k.a. Christy Flud, Petitioner's alleged common-law wife. Petitioner advises that his original trial attorney, John Echols, requested a motion to suppress Ms. Windel's testimony as marital communications but the state court judge found they did not have a valid common law marriage (Dkt. # 6 at 91). It is not the province of this Court to re-examine state court determinations on state law questions. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). This Court, therefore, will not reconsider

the state court's determination that there was no common law marriage between Christy Windel and Mr. Richie at the time of trial. Accordingly, it would have been futile for counsel to argue that the marital privilege applied and, as a result, counsel was not ineffective for failing to raise this issue. See Strickland, 466 U.S. at 687.

## XI.     Flight instruction error (ground 11)

In his direct appeal proceedings, Petitioner challenged the constitutionality of an instruction given to the jury at the conclusion of the first stage of his trial. See Brief of Appellant in OCCA Case No. F-93-1095, at 49. In a case decided just months before the filing of Petitioner's appeal brief, the OCCA held that this same type of instruction, commonly referred to as a "flight instruction," supported a reversible error argument in certain circumstances. Mitchell v. State, 876 P.2d 682, 685 (Okla. Crim. App. 1993), *opinion corrected* 887 P.2d 335 (Okla. Crim. App. 1994). The OCCA, however, declined to apply its holding in Mitchell to Petitioner's case, finding that the "rule in Mitchell was an interpretation and application of state law and did not create any new constitutional right." Id. (citing Rivers v. State, 889 P.2d 288 (Okla. Crim. App. 1994)). The state appellate court further concluded that Mitchell is "prospective only and is not applicable to cases pending[18] when *Mitchell* was decided." Richie, 908 P.2d at 276-77.

In ground eleven of this habeas proceeding, Petitioner challenges the constitutionality of the OCCA's decision. He argues that the OCCA was required by the Equal Protection Clause of the United States Constitution to apply the Mitchell rule to every similarly situated litigant (Dkt. # 6 at

_____

[18] The Mitchell decision was handed down on December 15, 1993. Mitchell, 876 P.2d 682 (Okla. Crim. App. 1993). Petitioner's direct appeal was initiated on October 20, 1993, and his Petitioner in Error was filed on April 14, 1994. See docket sheet for OCCA F-93-1095 at www.oscn.net.

95). He also claims that the OCCA's refusal to apply <u>Mitchell</u> retroactively was a violation of his due process rights (Dkt. # 8 at 31). Significantly, Petitioner does not challenge the constitutionality of the flight instruction itself, or the use of the flight instruction at his trial. In his own words, the alleged Constitutional violation addressed in ground eleven "occurred during Mr. Richie's direct appeal." <u>Id.</u> Respondent contends the issue is procedurally barred (Dkt. # 7 at 62-64). It is not necessary to analyze the procedural bar issue, however, because Petitioner's ground eleven claim, in the manner he has presented the issue to this Court, is not cognizable in these habeas proceedings.

The constitutionality of the OCCA's decision not to apply its <u>Mitchell</u> decision retroactively is not a proper subject for this federal habeas action. Petitioner's principal constitutional argument does not revolve around trial error, but about matters that occurred subsequently (Dkt. # 8 at 31). He maintains that the OCCA improperly refused to apply its new rule of law retroactively. This error, if it is error, is one of state law not cognizable in habeas corpus because "federal habeas corpus relief does not lie for errors of state law." <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990). The alleged constitutional errors Petitioner raises focus only on the state appellate court's decision not to apply a new state rule retroactively, and not the judgment which provides the basis for his incarceration.[19] The habeas writ provides a basis for challenging the legality of a prisoner's confinement, which rests upon his initial conviction. Even if the state appellate court's application of its own laws were

---

[19] Respondent urges the Court to deny this claim on procedural bar grounds, noting that Petitioner did not raise this specific claim in his post-conviction proceedings. Respondent argues that the issue is unexhausted but would be procedurally barred if raised in a second post-conviction proceeding. Thus, the OCCA has not been presented with the issue of the constitutionality of its decision relating to the non-retroactivity of the <u>Mitchell</u> rule. <u>See</u> Dkt. # 7 at 62-63. Petitioner replies that he presented this specific issue in a request for rehearing of his direct appeal, but the OCCA denied his request (Dkt. # 8 at 31). <u>See</u> <u>also</u> "Ground II" in Petition for Rehearing filed in OCCA Case No. F-93-1095.

defective, the defect does not impugn Petitioner's conviction or the legality of his confinement. See

e.g., Sellers v. Ward, 135 F.3d 1333, 1339 (10th Cir. 1998). Petitioner attacks a proceeding collateral

to his detention and not on the detention itself. Hopkinson v. Shillinger, 866 F.2d 1185, 1219 (10th

Cir. 1989), *overruled on other grounds by* Sawyer v. Smith, 497 U.S. 227 (1990). This Court's role

is limited to examining the events that occurred in the proceedings leading up to Petitioner's

conviction. See United States v. Dago, 441 F.3d 1238, 1249 n.5 (10th Cir. 2006); Hassine v.

Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998). Petitioner's challenge to the OCCA's decision has

absolutely nothing to do with the reason for his confinement.   Accordingly, this Court concludes that

Petitioner's eleventh ground for relief insofar as he is challenging the OCCA's decision not to apply

the Mitchell decision retroactively, is not cognizable in these proceedings, and shall be denied for that

reason.

　　　　To the extent Petitioner may intend for his ground eleven claim to be a challenge to the

OCCA's denial of his underlying flight instruction claim because it is an unreasonable application

of Supreme Court law, 28 U.S.C. §2254(d)(1), his claim is without merit. At the center of Petitioner's

underlying claim is the following instruction given to his jury at the conclusion of first-stage

proceedings:

　　　　Evidence has been introduced of the defendant's departure shortly after the
alleged crime was committed. You must first determine whether this action by the
defendant constituted flight. The term "flight," as it is used in this instruction, means
more that departure or concealment. To be in flight, a defendant must have departed
with a consciousness of guilt in order to avoid arrest.

　　　　To find that the defendant was in flight you must find beyond a reasonable
doubt that:

| First, | the defendant departed, |
| Second, | with a consciousness of guilt, |
| Third, | in order to avoid arrest for the crime with which he is charged. |

If after consideration of all the evidence on this issue, you find beyond a reasonable doubt that the defendant was in flight, then this flight is a circumstance which you may consider with all the other evidence in this case in determining the question of the defendant's guilt or innocence. However, if you have a reasonable doubt that the defendant was in flight, then the fact of any departure is not a circumstance for you to consider.

O.R. Vol. III at 439 (Instruction No. 20). Mitchell held that this type of flight instruction should be given only "where the evidence [of flight] is controverted." Mitchell, 876 P.2d at 685. The Tenth Circuit Court of Appeals has recognized that Mitchell reversed "decades of [Oklahoma] jurisprudence dealing with the flight instruction." Spears v. Mullin, 343 F.3d 1215, 1250 (10th Cir. 2003)(quoting Pickens v. State, 910 P.2d 1063, 1070 (Okla. Crim. App. 1996)). A flight instruction identical to the one presented to Petitioner's jury was examined in Nguyen v. Reynolds, 131 F.3d 1340 (10th Cir. 1997).

A § 2254 petitioner has a heavy burden in attempting to set aside a state conviction based on an erroneous jury instruction. Maes v. Thomas, 46 F.3d 979, 984 (10th Cir. 1995). As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, "unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law." Long v. Smith, 663 F.2d 18, 23 (6th Cir. 1981) (citing Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977)). In Henderson, the Supreme Court stressed "[t]he question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" 431 U.S. at 154, 97 S.Ct. at 1737 (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973)).

"The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." The question ... is not whether the [challenged] instruction is "undesirable, erroneous, or even 'universally condemned,'" but whether the instruction so infected the trial that the resulting conviction violates due process.

Maes, 46 F.3d at 984 (quoting Henderson, 431 U.S. at 154, 97 S.Ct. at 1736-37) (citations omitted). Nguyen clearly cannot meet this high standard. Without ultimately passing on the desirability of the challenged flight instruction, we conclude its use in

this case did not so infect Nguyen's trial as to deprive him of a fair trial or due process of law. The challenged instruction informed the jury it first had to determine whether Nguyen's departure after the crime was committed constituted "flight." Only if it determined the departure constituted "flight" could it consider this as circumstantial evidence of guilt. Although the instruction could have been more artfully drafted, it did not allow the jury to conclude Nguyen was guilty simply because of his departure. To the contrary, it specifically indicated that evidence of departure could be considered only if the jury drew a specific set of inferences from the departure. *See generally* United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977) (outlining inferences that must be drawn in determining probative value of flight as circumstantial evidence of guilt). Nor did the instruction alter the presumption of innocence. The trial court specifically instructed the jury that Nguyen was presumed innocent and had to be proven guilty beyond a reasonable doubt. Nothing in the flight instruction controverted those general instructions. Accordingly, we conclude there is no merit to the assertion that the instruction violated Nguyen's constitutional rights.

Id. at 1357. Like Nguyen, this Court finds that Petitioner's trial was not rendered so fundamentally unfair as to deprive him of a fair trial and due process of law due to the defective instruction. His jury was not allowed to consider Petitioner guilty simply because of his departure. The challenged instruction allows the jury to consider Richie's flight from the crime as a circumstance tending to prove guilt. Petitioner has not demonstrated that his constitutional rights were violated when the trial court instructed the jury with Instruction No. 20. Accordingly, he has not shown that the OCCA's rejection of this claim was an unreasonable application of Supreme Court law. 28 U.S.C. § 2254(d)(1). He is not entitled to habeas relief on ground eleven.

**XII.    Infirmities in information and instructions (ground 12)**

In his next ground for relief, Petitioner relies upon Schad v. Arizona, 501 U.S. 624 (1991), for the proposition that his due process rights were violated when the OCCA reversed only the felony murder conviction and not the malice aforethought first degree murder conviction. See Dkt. # 6 at 101-03. He also claims the OCCA's decision violated *ex post facto* principles. Id. at 102-03. Although Petitioner advises that Oklahoma's single first degree murder statute has "multiple means

68

of proving the crime," he seems to be arguing that because the OCCA reversed one means of proving the crime (felony murder) it must dismiss all other possible means of proving the crime, including malice aforethought murder. Id. at 102. The Court fails to see how the OCCA's ruling was an "abrupt departure from its settled single crime definition of first degree murder." Id.

Further, Petitioner states that this claim "is grounded principally on the Court of Criminal Appeals' actions on direct appeal." See Dkt. # 8 at 35. As explained in the section addressing ground eleven above, habeas review is limited to constitutional trial errors, not matters that occurred subsequently in collateral or appeal proceedings. Sellers, 135 F.3d at 1339. In Petitioner's reply he acknowledges that the "claim did not exist in any form when the appellate briefs were filed." See Dkt. # 8 at 36. Accordingly, the Court finds that Petitioner's twelfth ground for relief is not cognizable in the instant habeas corpus case, and shall be denied for that reason. Even if the claim were cognizable, the Court finds no constitutional violation in the OCCA's ruling which dismissed the felony murder conviction but affirmed the malice aforethought murder conviction based on an alternate means of proving the murder.

## XIII.   Avoiding arrest aggravator (ground 13)

In ground thirteen, Petitioner challenges the application of the avoid arrest aggravating circumstance in the second stage of his trial. He first asserts his constitutional rights were violated because the prosecution submitted insufficient evidence to prove the murder was committed for the purpose of avoiding or preventing a lawful arrest, one of three aggravators found by the jury to exist in this case.  Specifically, Petitioner argues that the "avoid arrest" aggravating circumstance was applied in an unconstitutional manner because it was not supported by a predicate crime apart from

the murder itself for which Richie sought to avoid arrest or prosecution. Richie raised this issue on direct appeal, arguing that the State presented no evidence that indicated the victim was killed to eliminate her as a witness. See Brief of Appellant in OCCA Case No. F-93-1095 at 95.  The OCCA rejected the claim, finding as follows:

> In his fourteenth proposition of error, appellant alleges the evidence that he killed Mrs. Launhardt to avoid lawful arrest or prosecution is insufficient to support the jury's finding with respect to that aggravating circumstance.

> "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed." *Romano v. State*, 847 P.2d 368, 387 (Okl.Cr.1993), *affirmed, Romano v. State*, 512 U.S.1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). "In making this determination, this Court should view the evidence in the light most favorable to the State." *Id.*

> When reviewing the aggravating circumstance of murder for the purpose of avoiding or preventing lawful arrest or prosecution, the existence of this circumstance is determined by looking at the killer's intent. *Romano*, 847 P.2d at 387. In the absence of his own statements as to intent, such evidence may be inferred from circumstantial evidence. *Id.*

> Evidence presented by the State showed that appellant murdered the victim to avoid arrest and prosecution for her kidnapping and the theft of her credit cards and van. Such was inferred by evidence that the victim was taken to an abandoned house in an isolated area where her hands and ankles were bound in order to confine her. Not content to simply leave her and make a getaway, the evidence presented supported the conclusion that appellant chose to kill the victim to prevent her from subsequently identifying him. We find this to be sufficient evidence from which a rational juror could have found beyond a reasonable doubt the existence of this aggravating circumstance. *Id.* Accordingly, this assignment of error is without merit.

Richie, 908 P.2d at 279.

In assessing a sufficiency of the evidence claim, the relevant question is whether, after viewing all of the evidence in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating factor beyond a reasonable doubt. Lewis v. Jeffers, 497 U.S. 764, 780-82 (1990) (citing "rational factfinder" standard established in Jackson v. Virginia, 443

U.S. 307 (1979)); <u>Sallahdin v. Gibson</u>, 275 F.3d 1211, 1231 (10th Cir. 2002). As noted earlier, the Tenth Circuit has not yet resolved whether sufficiency of the evidence is a factual or a legal question. <u>Hale</u>, 227 F.3d at 1335 n.17.  Accordingly, the OCCA's determination of this issue in Petitioner's direct appeal shall be reviewed pursuant to 28 U.S.C. § 2254(d)(1) and (2).

In determining there was sufficient evidence to support this aggravator the OCCA considered the following: (1) the victim was taken to an abandoned house where her hands and ankles were bound in order to confine her; and (2) Mrs. Launhardt was murdered so she could not identify Richie in a prosecution for her kidnapping and the theft of her credit cards and van. <u>Richie</u>, 908 P.2d at 279. In light of the evidence that was presented in Richie's state court trial, the OCCA's decision was not based upon an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Further, the state appellate court applied the correct Federal law when it concluded, "We find this to be sufficient evidence from which a rational juror could have found beyond a reasonable doubt the existence of this aggravating circumstance." <u>Richie</u>, 908 P.2d at 279. This Court finds that the OCCA's adjudication did not result in a decision that was contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). <u>See</u> <u>also</u> <u>Lewis v. Jeffers,</u> 497 U.S. 764, 780-82 (1990). Petitioner is not entitled to habeas corpus relief on this portion of his ground thirteen claim.

In the second part of ground thirteen, Petitioner alleges that the jury was not informed of the predicate felony, separate from the murder itself, which motivated him to murder Mrs. Launhardt in order to avoid arrest. He also argues that there was no separate antecedent crime because the kidnaping, robbery and murder were not factually distinct from one another.  A careful review of the state court record reveals that this issue has never been "fairly presented" to the OCCA for review.

71

Thus, the Court finds that the issue is unexhausted. As noted earlier in this opinion, although the Court could require Petitioner to return to state court to raise the claim in a second post-conviction application, the OCCA routinely applies a procedural bar to such claims unless the petitioner provides "sufficient reason" for his failure to raise the claim in an earlier proceeding.  Okla. Stat. tit. 22, § 1086; Moore v. State, 889 P.2d 1253 (Okla. Crim. App. 1995).  Because this claim would be subject to a procedural bar in the state courts, the Court finds it would be futile to require Petitioner to exhaust this claim.  See Duckworth v. Serrano, 454 U.S. 1, 3 (1981) (the futility exception is a narrow one, and is supportable "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief"); see also Coleman, 501 U.S. 722; Steele, 11 F.3d at 1524. Accordingly, because exhaustion would be futile, this second portion of Petitioner's ground thirteen claim is not barred by the exhaustion requirement.

However, under the procedural default doctrine, this Court may not consider the second part of Petitioner's ground thirteen claim unless he is able to show cause and prejudice for the procedural default, or demonstrate that a fundamental miscarriage of justice would result if his claim is not considered.  See Coleman, 501 U.S. at 750.  Petitioner offers no explanation for his procedural default, nor does he acknowledge that the issue has not previously been raised. He does not argue cause and prejudice, or fundamental miscarriage of justice. Therefore, because Petitioner has not demonstrated "cause and prejudice" or that a "fundamental miscarriage of justice" will result, the Court concludes that it is procedurally barred from considering Petitioner's Ground Thirteen claim on the merits, insofar as the allegations relate to the predicate crime underlying his motive to avoid arrest as defined in the avoid arrest aggravator. Coleman, 501 U.S. at 724.

**XIV.   Heinous, atrocious or cruel aggravator (ground 14)**

In his fourteenth proposition of error, Petitioner presents a two-part argument attacking the heinous, atrocious or cruel ("HAC") aggravator used at this trial. First, he asserts that the jury was misinstructed on the HAC aggravator. Second, he argues that there was insufficient evidence to support the aggravator.

*Improper instruction on heinous, atrocious, or cruel aggravating circumstance*

Petitioner contends that his constitutional rights were violated when the trial court improperly instructed the jury on the HAC aggravating circumstance by omitting the word "physical" from the last sentence of the instruction (Dkt. # 6 at 111). Relying on Oklahoma case law applicable at the time, Petitioner argues stated that the phrase "heinous, atrocious or cruel" is restricted to "murders in which torture or serious physical abuse is present." See Dkt. # 6 at 110, citing Stouffer v. State, 742 P.2d 562, 563 (Okl. Crim. App. 1987).

Instruction number 9, as read to the jurors in Petitioner's trial, stated:

> As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
>
> The phrase "especially heinous, atrocious or cruel" is limited to those crimes where the death of the victim was preceded by conscious torture of the victim or serious abuse. (emphasis added).

See O.R. Vol. III at 579. Petitioner argues that the phrase "serious abuse" does not comply with the mandates of Maynard v. Cartwright, 486 U.S. 356 (1988), which require instructions to limit  and channel the jury's attention. He claims the modified phrase lessens the standard required by the Supreme Court for aggravating circumstances used in death penalty cases. Respondent contends that the omission of the word "physical" from the last sentence in the instruction did not destroy the narrowing function of the instruction.

This precise issue has been addressed by the Tenth Circuit Court of Appeals on more than one occasion. The Circuit Court has determined that, "[D]espite the omission of the word 'physical' from the instruction, the instruction still performed its required narrowing function and imposed restraint upon the sentencer." Miller v. Mullin, 354 F.3d 1288, 1300 (10th Cir. 2004); Turrentine v. Mullin, 390 F.3d 1181, 1196 (10th Cir. 2004).

As in both the Miller and Turrentine cases, the OCCA determined in Petitioner's appeal that the omission of the word "physical" was error, but harmless error. Richie, 908 P.2d at 278. Specifically, the OCCA found that the error in Petitioner's case was harmless because the instruction "properly channelled [sic] the sentencer's discretion," and the phrase "serious abuse" is commonly interpreted as referring to physical abuse. Furthermore, the OCCA found that in the specific facts of Petitioner's case, the jury's focus would have been on the "conscious torture" element rather than the abuse element. Id.

The state appellate court adjudicated this claim of error on the merits. Petitioner is not entitled to habeas relief from this Court unless the state appellate court's ruling is contrary to, or constitutes an unreasonable application of, federal law. Williams v. Taylor, 529 U.S. 362, 364 (2000); 28 U.S.C. § 2254(d)(1). Because the OCCA did not directly reference any federal law upon which it relied, this Court will apply the harmless-error standard originally set forth in Kotteakos v. United States, 328 U.S. 750 (1946). The test is whether the incorrect wording in the instruction had "substantial and injurious effect or influence in determining the jury's verdict." Id. at 776. See also California v. Roy, 519 U.S. 2 (1997); Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

This Court agrees with the state appellate court's assessment of this portion of Petitioner's ground fourteen issue. The omission of the word "physical" from the last sentence in the "heinous,

atrocious or cruel" instruction did not have a substantial and injurious effect or influence in determining the jury's verdict. The OCCA's determination that use of the incorrect wording was harmless error does not constitute an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1); Miller, 354 F.3d at 1300; Turrentine, 390 F.3d at 1196. Habeas relief on this issue is denied.

<em>Insufficient evidence to support aggravator</em>

In the second part of his ground fourteen claim, Petitioner argues that there was insufficient evidence to support the heinous, atrocious or cruel aggravating circumstance. Respondent responds that this particular argument was not presented to the state courts for consideration and must be denied as procedurally barred. Petitioner replies that his direct appeal counsel specifically argued that the evidence was insufficient to support the HAC aggravating circumstance (Dkt. # 8 at 39, citing to Brief of Appellant in OCCA Case. No. F-93-1095 at 93). Petitioner also advises that his post-conviction attorney presented the argument that the trial judge indicated there was not sufficient evidence presented to support the HAC aggravator (Id., citing to Postconviction Addendum Vol. 1 at 40). A review of Petitioner's direct appeal brief confirms that he did present this issue to the OCCA as part of Proposition XIII. However, in deciding Petitioner's Proposition XIII, the state appellate court only discussed the instructional error concerning omission of the word "physical." Richie, 908 P.2d at 278-79. Nevertheless, in its mandatory sentence review pursuant to Okla. Stat. tit. 21, § 701.13(c), the OCCA upheld Richie's death sentence, specifically finding that all aggravating circumstances were supported by sufficient evidence.[20] Id. at 280. Although the OCCA did not

---

[20] The OCCA stated, "As discussed above, we found the State presented sufficient evidence to prove appellant murdered Laura Launhardt to avoid arrest or prosecution, that the murder was especially heinous, atrocious or cruel and that there existed the probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See supra*, Propositions XII, XIII and XIV." Richie, 908 P.2d at 280. However, Proposition XIII, dealing with

discuss its reasoning in finding the HAC aggravator was supported by sufficient evidence, this Court must give deference to the state court's decision. See Paine v. Massie, 339 F.3d 1194, 1198 (10th Cir. 2003) ("Even if a state court resolves a claim in a summary fashion with little or no reasoning, we owe deference to the state court's result."); Cook v. McKune, 323 F.3d 825, 831 (10th Cir. 2003) (recognizing federal courts give deference to state court decisions even if state court did not discuss and may not have been aware of Supreme Court precedence); Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). Accordingly, this Court will analyze the merits of Petitioner's claim under AEDPA criteria.

As previously discussed, the appropriate standard of review is the rational factfinder test established in Jackson, 443 U.S. at 319. See Lewis v. Jeffers, 497 U.S. 764, 781 (1990). The relevant habeas question under the Jackson standard is to ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [aggravating circumstance] beyond a reasonable doubt." Jackson, 443 U.S. at 319; Lewis, 497 U.S. at 783 (considerations also apply to federal habeas review of state court's finding of aggravating circumstances). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. The Tenth Circuit has emphasized that, under Jackson, review is "sharply limited" and a court "faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting Wright v. West, 505 U.S. 277,

_____

the HAC aggravator makes no mention of sufficiency of the evidence. Id. at 278-79.

296-97 (1992)).  This Court's review is limited to deciding whether the OCCA's decision that there was sufficient evidence to support a jury's finding of the HAC aggravator was contrary to or an unreasonable application of Jackson. 28 U.S.C. § 2254(d)(1); Spears v. Mullin, 343 F.3d 1215, 1238 (10th Cir. 2003).

In applying the Jackson standard, the Court looks to Oklahoma law to determine the substantive elements of the aggravating circumstance. Oklahoma has limited application of the HAC aggravator to those crimes where the victim's death was preceded by torture or serious physical abuse. Medlock v. Ward, 200 F.3d 1314, 1321 (10th Cir. 2000). Torture includes the infliction of either great physical anguish or extreme mental cruelty, while physical abuse requires evidence of conscious physical suffering. Romano v. Gibson, 299 F.3d 1156, 1176 (10th Cir. 2001). Torture "must be the result of intentional acts by the defendant. . . [and] must produce mental anguish in addition to that which of necessity accompanies the underlying killing." Brown v. Sirmons, 515 F.3d 1071, 1090 (10th Cir. 2008) (citing Berget v. State, 824 P.2d 364, 373 (Okla. Crim. App. 1991). Petitioner claims that the evidence did not support the jury's finding that the murder was especially heinous, atrocious or cruel because the murder was not preceded by either torture or serious physical abuse. While there is little or no evidence of serious physical abuse in this case, the facts support a finding of extreme mental cruelty. Mrs. Launhardt was bound and restrained sometime on August 28, 1991. Bank and credit card records indicate that Richie and Waller abandoned her on August 28th and never returned. Her decomposing body was not discovered until September 1. A jury could make a reasonable inference from these facts that Mrs. Launhardt suffered mental anguish before she died, as a result of the acts of Richie and Waller. This Court finds that the OCCA's conclusion that there was sufficient evidence to support the HAC aggravating circumstance is not an unreasonable

application of <u>Jackson</u>, nor is it an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. 2254(d). Habeas relief shall be denied on this claim.

**XV.    Continuing threat aggravator (ground 15)**

Petitioner next asserts that the continuing threat aggravating circumstance is unconstitutional because it is overbroad. He also argues that, in Oklahoma, jurors are "misinformed on how to apply properly the aggravator." <u>See</u> Dkt. # 6 at 117-18. Petitioner acknowledges that the Tenth Circuit has repeatedly rejected challenges to the constitutionality of Oklahoma's continuing threat aggravating circumstance.

In rejecting this argument on direct appeal, the OCCA noted that this aggravating circumstance has been analyzed and upheld as specific, not vague, and readily understandable. <u>Richie</u>, 908 P.2d at 278. Further relying on <u>Barefoot v. Estelle</u>, 463 U.S. 880 (1983), the OCCA observed that the constitutionality of the continuing threat aggravating circumstance has been upheld by the United States Supreme Court. <u>Id.</u> Petitioner also acknowledges that the Tenth Circuit has rejected challenges to the constitutionality of Oklahoma's continuing threat aggravator (Dkt. # 6 at 117). Petitioner asserts that the Circuit Court has only addressed the vagueness of the aggravator, and not its overbroad characteristics. However, Petitioner's overbroad argument has also been rejected by the Circuit:

> Similarly, circuit precedent forecloses Mr. Brown's challenge to the constitutionality of the continuing threat aggravator, which he raises to preserve the claim for Supreme Court review. Under Oklahoma law, the continuing threat factor requires "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Okla. Stat. Ann. tit. 21, § 701.12(7). We have repeatedly upheld the constitutionality of this aggravating factor, finding it neither unconstitutionally vague <u>nor overbroad</u>. <u>See</u> <u>Ross v. Ward</u>, 165 F.3d 793, 800 (10th Cir. 1999); <u>Castro v. Ward</u>, 138 F.3d 810, 816-817 (10th Cir. 1998); <u>Nguyen v. Reynolds</u>, 131 F.3d 1340, 1353-54 (10th Cir. 1997).

Brown v. Sirmons, 515 F.3d 1072, 1092 (10th Cir. 2008) (emphasis added). Petitioner's ground fifteen claim is without merit.

## XVI.   Life without parole instruction inadequate (ground 16)

Petitioner next challenges the trial court's failure to instruct the jury adequately regarding life without parole. This claim was not presented to the OCCA for consideration on direct appeal. Raised for the first time in post-conviction proceedings, the issue was found to be waived as it could have been presented on direct appeal. Richie, 957 P.2d at 1195-96. The state appellate court also rejected Petitioner's argument that the failure of his appellate counsel to raise the issue on direct appeal constituted ineffective assistance of counsel. Id. Respondent urges this Court to uphold the procedural bar imposed by the state appellate court. Petitioner replies that his appellate counsel's ineffective assistance in failing to raise the issue on direct appeal excuses any procedural default. Further, intervening Supreme Court law established in Simmons v. South Carolina, 512 U.S. 154 (1994),[21] renders the OCCA's application of a waiver inadequate as to this claim (Dkt. # 8 at 40-41). Petitioner relies upon Walker v. Attorney General, 167 F.3d 1339, 1345 (10th Cir. 1999), to support his claim that Oklahoma's procedural bar of his ground fifteen claim is inadequate.

Ordinarily, this Court will not consider issues that have been defaulted in state court on an

---

[21] The Supreme Court in Simmons addressed whether due process required a state trial court "to instruct the jury in the penalty phase of a capital trial that under state law the defendant was ineligible for parole." Simmons, 512 U.S. at 156. The Supreme Court has reinforced its decision that due process entitles a defendant to inform his jury that he would be parole ineligible if the only available alternative sentence to death is life imprisonment without possibility of parole and where future dangerousness is in issue. See Shafer v. South Carolina, 532 U.S. 36, 51 (2001); Kelly v. South Carolina, 534 U.S. 246 (2002). The Tenth Circuit has examined Oklahoma's capital sentencing scheme in light of Simmons and its progeny, and concluded that it is insufficient, except in limited circumstances. Hamilton v. Mullin, 436 F.3d 1181, 1191 (2006) (citing factors under which due process concerns arise as explained in Mollett v. Mullin, 348 F.3d 902, 909-10 (10th Cir. 2003)).

independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. Hickman v. Spears, 160 F.3d 1269, 1271 (10th Cir.1998); see also Coleman v. Thompson, 501 U.S. 722, 750 (1991). The Tenth Circuit has held that in the interest of efficiency, however, a court can "avoid deciding procedural bar questions where claims can readily be dismissed on the merits." Brown v. Sirmons, 515 F.3d 1072, 1092-93 (10th Cir. 2008) (citing Snow v. Sirmons, 474 F.3d 693, 717 (10th Cir. 2007)). Rather than analyze the adequacy of the state court's procedural bar of this claim, the Court finds that in the interest of efficiency, Petitioner's ground sixteen claim can be more readily addressed and disposed of on the merits.

In this sixteenth proposition of error, Petitioner complains that his jury was not properly instructed in second stage sentencing proceedings because no definition was given for the term "life without parole." He argues that his constitutional rights were violated because there was a high risk that his jury did not understand that a person sentenced to life without parole would never be released on parole. See Dkt. # 6 at 119-20. Petitioner relies primarily upon Simmons v. South Carolina, 512 U.S. 154 (1994), Shafer v. South Carolina, 532 U.S. 36 (2001), and Kelly v. South Carolina, 534 U.S. 246 (2002).[22] In Simmons, the Supreme Court held that where the defendant's future dangerousness is at issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process requires that the sentencing jury be informed  that the defendant is parole ineligible. Id. at 156. The Supreme Court more recently addressed the issue whether a defendant has a right in a capital case to inform the jury that, under the governing law, he would not be eligible for

---

[22] Petitioner submitted a notice of supplemental authorities incorporating the law decided in Shafer and Kelly (Dkt. # 76).

parole in the event the jury sentences him to life imprisonment. In <u>Shafer v. South Carolina</u>, 532 U.S. 36 (2001), the jury, as in <u>Simmons,</u> was only given two sentencing options–either life imprisonment or death.

The Tenth Circuit Court of Appeals has taken the opportunity to analyze the merits of a <u>Simmons</u> claim several times in the context of a habeas proceeding. In the first case, <u>Mayes v. Gibson</u>, 210 F.3d 1284, 1294 (10th Cir. 2000), the Circuit Court found no violation of <u>Simmons</u> because the trial court did not create a false choice for the jury when it instructed on the three sentencing options of life, life without the possibility of parole, and death. In the second case, the Circuit Court found no violation of <u>Simmons</u> when the trial judge answered the jury's question regarding the life without parole sentencing option by stating, "[R]ead the Instructions, they speak for themselves." <u>McGregor v. Gibson</u>, 219 F.3d 1245, 1256 (10th Cir. 2000), *rev'd on other grounds on reh'g en banc* at 248 F.3d 946 (10th Cir. 2001). In two other cases, the Circuit Court adopted the rationale of <u>Mayes</u> without additional discussion or analysis. <u>(Vincent) Johnson v. Gibson</u>, 229 F.3d 1163 (10th Cir. 2001) (unpublished); <u>Neill v. Gibson</u>, 263 F.3d 1184, 1198 (10th Cir. 2001).

After the <u>Shafer</u> decision by the United States Supreme Court, the Circuit Court set forth an expansive discussion of <u>Simmons</u> as well as <u>Shafer</u>. <u>(Mark David) Johnson v. Gibson</u>, 254 F.3d 1155 (10th Cir. 2001). In <u>Johnson</u>, the jury inquired, during deliberations, "We need to know! Is life without parole firm - Does it mean he can *never* be paroled [?]" <u>Id.</u> at 1164 (emphasis in original). The trial judge responded, "[I]t is inappropriate for you to consider the question asked." <u>Id.</u> In resolving the issue before it, the Tenth Circuit Court of Appeals addressed its prior precedents and distinguished <u>Mayes</u>:

> In this case, on the other hand, the trial court instructed the jury on its three discrete sentencing options available under Oklahoma law - death, life imprisonment

81

and life imprisonment without the possibility of parole. We have held that instructing on these three options, without any further explanation, satisfies <u>Simmons</u>. <u>See Mayes</u>, 210 F.3d at 1294. Further, a trial court, in response to a jury's inquiry as to the meaning of a life sentence without parole, may simply refer the jury back to the instructions as given. *See* <u>McGregor v. Gibson</u>, 219 F.3d 1245, 1256 (10th Cir. 2000), *reh'g granted on other grounds*. However, instead of simply referring the jury back to the court's original instructions, "the trial court told the jury it was not appropriate for it to consider whether the defendant could 'never be paroled.'" <u>Johnson</u>, 928 P.2d at 320.

In Oklahoma, "the jury is not to be told of the inner workings of the parole system, even when it must compare two life sentences: one with the possibility of parole, and one without the possibility of parole." *Id.* This, however, does not obviate the need for a correct instruction concerning the three options, including life without parole. <u>Simmons</u>, 512 U.S. at 166. That a state may limit information given to juries about parole does not eliminate the need to inform the jury of parole ineligibility where future dangerousness is at issue. <u>Id</u>. at 168-69 [,] . . . [where, as in Oklahoma,] "the jury must consider the distinctions between life, life without parole and death as it reaches its sentencing decision." <u>Johnson</u>, 928 P.2d at 320.

<u>Id</u>. at 1165 (parallel citations omitted). The Circuit Court concluded that the trial court's response stating it was inappropriate for the jury to consider parole eligibility did not refer the jury back to the instructions, but contradicted the instructions. <u>Id</u>. ("The trial court did more than give a non-responsive answer - it told the jury that parole eligibility could not be considered when plainly it could be.") In a concurring opinion, Judge Henry stressed that both the <u>Simmons</u> and <u>Shafer</u> decisions focused on whether the misunderstanding of the jury had the effect of creating a false choice of sentencing options for the jury to consider. <u>Id</u>. at 1167-68.

The Tenth Circuit Court of Appeals also affirmed the district court's grant of habeas corpus relief on this issue in <u>Mollett v. Mullin</u>, 348 F.3d 902, 909 (10th Cir. 2003). As in the <u>Johnson</u> case, Mr. Mollett's trial judge responded to the jury's question whether life without parole meant the defendant could never be paroled by advising them, "[I]t is inappropriate for you to consider the question asked." <u>Id</u>. at 909. The Circuit Court summarized the requirements of <u>Simmons</u> and <u>Shafer</u>

as follows:

> Under <u>Simmons</u>, a defendant's due process rights are violated in cases like the instant one where: (1) the prosecution seeks the death penalty; (2) the prosecution places the defendant's "future dangerousness . . . at issue," <u>Shafer</u>, 532 U.S. at 51; (3) the jury asks for clarification of the meaning of "life imprisonment," or a synonymous statutory term, <u>Shafer</u>, 532 U.S. at 45; and (4) the judge's response threatens to cause "a jury's misunderstanding so the jury will . . . perceive a 'false choice' of incarceration when future dangerousness is at issue." <u>Johnson</u>, 254 F.3d at 1166; <u>see also</u> <u>Shafer</u>, 532 U.S. at 51 ("<u>Simmons</u>' due process concerns arise" if there are "'misunderstanding[s]' to avoid, [or] 'false choice[s]' to guard against.")(quoting <u>Simmons</u>, 512 U.S. at 161).

<u>Id.</u> at 914 (parallel citations omitted).

In the case at hand, Mr. Richie satisfies only the first two of the four requirements set out in <u>Mollett</u>. First, this was a capital case. Second, the state placed Petitioner's future dangerousness at issue by seeking the death penalty based upon Oklahoma's continuing threat aggravating circumstance. Under existing precedent, Mr. Richie "must show that the jury asked for clarification of the meaning of life imprisonment or the judge's instructions created the possibility of jury misunderstanding." <u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1192 (10th Cir. 2006). Petitioner has not established either element. Accordingly, he is not entitled to relief on this issue. Petitioner's sixteenth ground for relief is denied.

## XVII.  Erroneous sentencing instruction (ground 17)

Petitioner's ground seventeen claim alleges that an erroneous second stage jury instruction[23]

---

[23] Petitioner challenges the wording in the third paragraph of second stage instruction No. 16, which reads as follows:

> You may not consider death as a punishment unless you have unanimously found, beyond a reasonable doubt, that Lonnie Wright Richie killed, intended to kill, or knew or should have known a killing would occur during the course of his actions.

> If you do not unanimously find this beyond a reasonable doubt, then you may

impermissibly skewed the weighing process required of jurors. This specific challenge to the instruction was not presented to the state appellate court for review and Respondent urges this Court to decline to reach the merits on procedural bar grounds. Petitioner acknowledges that he did not present it for review to the OCCA, but contends that his default can be excused because the state appellate court considered the issue when conducting its mandatory sentencing review. He argues that, "Oklahoma's mandatory review for arbitrary factors infecting the death sentence operated as an implicit review of this erroneous instruction." See Dkt. # 6 at 124.

      Contrary to Petitioner's argument, this Court cannot conclude that the OCCA addressed the merits of this issue in its mandatory sentencing review on direct appeal.

> Although mandatory sentence review applies in all capital cases, *see* Okla. Stat. tit. 21, § 701.13(C), it does not take into consideration every possible attack on the aggravating circumstances. *Cf.* Medlock v. Ward, 200 F.3d 1314, 1320 n.3 (10th Cir. 2000) (mandatory sentence review "does not represent a full reweighing of aggravating and mitigating factors").

James v. Gibson, 211 F.3d 543, 558 (10th Cir. 2000). This Court concludes, contrary to Petitioner's argument,[24] that the OCCA did not address the merits of this issue in its mandatory sentence review.

---------------------------------------

> consider life imprisonment or life imprisonment without parole.
>
> If you do not find this unanimously beyond a reasonable doubt, then you must next consider whether the State has proved any of the aggravating circumstances beyond a reasonable doubt to your satisfaction.

See Dkt. # 6 at 124; O.R. Vol. III at 586.

[24] Petitioner argues that, "Because Oklahoma implicitly considers all matters potentially affecting a death sentence during the course of its direct appeal process, those errors are preserved for federal review." See Dkt. # 8 at 43-44. Following Petitioner's argument to its logical conclusion, he appears to be arguing that no claim of error in a habeas petition can be deemed unexhausted and, thus, procedurally barred, because the OCCA would have implicitly considered the issue in its mandatory review. That argument, of course, is untenable.

The Court finds that Petitioner's ground seventeen claim has never been fairly presented to the OCCA for review, and is unexhausted for habeas corpus purposes. As noted earlier, the Court could require Petitioner to return to state court to raise his unexhausted claim in a second post-conviction application, but the OCCA routinely applies a procedural bar to such claims unless the petitioner provides "sufficient reason" for his failure to raise the claim in an earlier proceeding. Okla. Stat. tit. 22, § 1086; Moore v. State, 889 P.2d 1253 (Okla. Crim. App. 1995). Because the claim would be subject to a procedural bar in the state courts, the Court finds it would be futile to require Petitioner to exhaust this claim. See Duckworth, 454 U.S. at 3; Coleman, 501 U.S. at 722; Steele, 11 F.3d at 1524. Accordingly, because exhaustion would be futile, Petitioner's ground seventeen claim is not barred by the exhaustion requirement.

However, under the procedural default doctrine, this Court may not consider the claim unless Petitioner is able to show cause and prejudice for the procedural default, or demonstrate that a fundamental miscarriage of justice would result if the claim is not addressed. Petitioner makes no attempt to demonstrate either cause or a fundamental miscarriage of justice based on actual innocence. Accordingly, this claim need not be addressed.

**XVIII. Errors in second stage jury instructions (ground 18)**

In proposition eighteen, Petitioner claims that second stage jury instructions violated his constitutional rights because (1) the trial court failed to instruct the jury that it could consider a sentence of life or life without parole even if they found the existence of one or more aggravating circumstances; and (2) the instructions failed to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous. These objections to second stage jury instructions were rejected by the OCCA on direct appeal.

85

*Instruction regarding sentencing options even if aggravators found*

Petitioner asserts in this portion of his eighteenth proposition that the trial court erred by failing to instruct the jury that it could consider a sentence of life or life without parole even if it found the existence of one or more aggravating circumstances. Petitioner acknowledges that the OCCA and the Tenth Circuit have repeatedly rejected this type of claim, but asserts that subsequent remedial measures changing Oklahoma's uniform instructions provide support for his argument that the instructions used in his trial were constitutionally deficient. The OCCA found:

> Next, appellant contends the court failed to instruct the jury that it had the option to return a life sentence regardless of its finding on aggravating and mitigating circumstances. This argument has consistently been rejected by this Court. *Johnson v. State*, 731 P.2d 993, 1003 (Okl.Cr.), *cert denied*, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987); *Davis v. State*, 665 P.2d 1186, 1203-04 (Okl.Cr.), *cert denied*, 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983); *Irvin v. State*, 617 P.2d 588, 597-98 (Okl. Cr. 1980). More recently, this Court determined that a trial court may give an instruction which would inform the jury of its right to return a sentence of life no matter how great the weight of evidence supporting the aggravating circumstances. *See Fox v. State*, 779 P.2d 562, 573 (Okl.Cr.1989), *cert denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990), (quoting *Walker v. State*, 723 P.2d 273, 284 (Okl.Cr.), *cert denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986)). Although a trial court can give the instruction, it is not error for the court to refuse to do so. *Romano*, 847 P.2d at 392. Therefore, this assignment of error fails.

Richie, 908 P.d at 279-80.

In addressing identical issues, the Tenth Circuit has held:

> Mr. Fox next argues that he is entitled to relief because the jury instructions given did not explicitly inform the jury that they were not required to give a sentence of death, even if they made a determination that the aggravating factors outweighed the mitigating factors. Mr. Fox properly recognizes that we have rejected this very claim in Duvall v. Reynolds, 139 F.3d 768, 789-91 (10th Cir. 1998). He urges that we nevertheless depart from our earlier holding given that the court there failed to consider the relevance of Oklahoma's revision of its uniform jury instructions in 1994, to include the instruction he sought at trial. This argument is likewise unavailing; the court squarely passed on this contention in Bryson v. Ward, 187 F.3d 1193, 1207 (10th Cir. 1999). In *Bryson*, we held that while the revised jury instruction clearly sets forth the settled law, the failure to give such an instruction is not

constitutional error. *Id.* As stated previously, this resolution binds this panel in the instant case.

Fox v. Ward, 200 F.3d 1286, 1300-01 (10th Cir. 2000). This Court must follow the precedent established by the Tenth Circuit, and finds that Petitioner is not entitled to habeas corpus relief on this ground.

*Mitigating circumstances instruction regarding unanimity*

Petitioner next complains that the jury instructions given in the second stage failed to specifically advise the jurors that unanimity was not required for mitigating circumstances. Relying primarily on McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988), Petitioner asserts that there was a reasonable likelihood that the jury interpreted the instructions as a whole to require a unanimous finding of mitigating circumstances. Petitioner's argument is unconvincing.

The Tenth Circuit's holding in Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998) is directly on point. "A trial court need not, however, expressly instruct a capital sentencing jury that unanimity is not required before each juror can consider a particular mitigating circumstance." Id. at 791. The Petitioner in Duvall also relied on McKoy and Mills to support his claim. Further, the instructions used by the trial court in Duvall, relevant to the mitigating and aggravating circumstances, were similar, and in most portions identical, to the ones used at Petitioner's trial. *Compare* Duvall, 139 F.3d at 791-92, *with* Petitioner's second stage instruction Nos. 12, 14, and 15 (O.R. Vol. III at 582, 584-85). In Duvall, the Tenth Circuit held, "that there is no reasonable likelihood that the jury applied these instructions in a way that required them to agree unanimously upon the existence of a mitigating circumstance before considering it." Id. at 792. Arguments similar to Petitioner's claim have been considered and rejected by the Tenth Circuit in other cases since Duvall. See Sallahdin v.

<u>Gibson</u>, 275 F.3d 1211, 1232 (10th Cir. 2002);  <u>Fox v. Ward</u>, 200 F.3d 1286, 1302 (10th Cir. 2000). Hence, the Court follows the precedent set by <u>Duvall</u> and later cases, and finds that Petitioner is not entitled to habeas relief on this issue.

### XIX.   Improper victim impact evidence (ground 19)

As his nineteenth proposition of error, Petitioner claims that the victim impact evidence introduced at his trial amounted to an improper "super" aggravating circumstance and that his jury was not instructed about how to consider the evidence. Respondent urges that the claim should be considered unexhausted and procedurally barred because it was not presented to the state court for consideration (Dkt. # 7 at 91). Petitioner agrees that the victim impact claim was "not presented explicitly" in state appellate proceedings, but should be reviewed on the merits for the same reasons propounded in his ground seventeen.[25] For the same reasons explained in the ground seventeen section, this Court finds that Petitioner's victim impact issue is unexhausted and would be procedurally barred by the OCCA if this Court required him to return to state court for a second post-conviction proceeding. Petitioner offers no further excuse for his procedural default. He does not present an argument for cause and prejudice, nor does he lay out a fundamental miscarriage of justice argument. This Court is procedurally barred from considering the merits of Petitioner's victim impact issues as set forth in his nineteenth ground for relief.

### XX.   Ineffective assistance of appellate counsel (ground 20)

Petitioner's claim of ineffective assistance of appellate counsel consists of two parts. First, Petitioner raises a generalized assertion that, to the extent this Court finds any claims should have

---

[25] Petitioner urges that his default should be excused because the OCCA would have considered the issue as part of its statutory mandatory sentence review.

been raised during Petitioner's state court direct appeal, appellate counsel "was clearly ineffective for not raising them." See Dkt. # 6 at 137. Second, Petitioner asserts that his appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim based on trial counsel's failure to challenge the jurisdiction of the court.

### General claim of ineffective assistance of appellate counsel

In Proposition 2 of Petitioner's application for post-conviction relief, Petitioner alleged that his appellate counsel failed "to raise critical and meritorious issues on direct appeal" in violation of his constitutional right to the effective assistance of counsel. See Petitioner's Application for Post-conviction Relief, Addendum Vol. I at 18, in Case No. PC-96-1556. In the state proceedings, Petitioner listed specific instances of alleged ineffective assistance of appellate counsel, all of which were rejected by the OCCA. However, in his petition for habeas corpus relief, Petitioner merely makes a cursory argument that his appellate counsel was ineffective. His allegation is too inadequately developed to allow this Court to apply controlling legal principles to the facts bearing on his constitutional claim. Petitioner's cursory treatment of his general claim of ineffective assistance of appellate counsel provides no basis for an analysis by this Court. Generalized allegations are insufficient to establish a violation of a constitutional right. See e.g., Femedeer v. Haun, 227 F.3d 1244, 1255 (10th Cir. 2000) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) for the proposition that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

### Failure to challenge jurisdiction of trial court

Petitioner next asserts that his direct appeal counsel failed to present "an absolute jurisdictional defense" because he was not properly bound over for trial after preliminary hearing

(Dkt. # 6 at 137-38). He complains that he never had a preliminary hearing on the felony murder charge, and inadmissable evidence was presented before the preliminary hearing magistrate and used to bind him over to state district court. Asserting that he was never bound over properly, Petitioner concludes that the district court lacked jurisdiction to proceed against him. See Dkt. # 6 at 138. The OCCA, applying its three-tiered analysis set forth in Walker v. State, 933 P.2d 327 (Okla. Crim App. 1997), *overruling by statute recognized in* Davis v. State, 123 P.3d 243, 245 (Okla. Crim. App. 2005) (citing to Okl. Stat. tit. 22, § 1089(D)(4) (2004)), rejected this claim as part of Petitioner's post-conviction appeal, finding that Petitioner had failed to carry his burden of establishing ineffective assistance by his appellate counsel. Richie, 957 P.2d at 1197. Because the OCCA's analysis of the ineffective assistance of appellate counsel claim deviated from the controlling federal standard of Strickland, it is not entitled to deference. Cargle v. Mullin, 317 F.3d 1196, 1205 (10th Cir. 2003). In evaluating Petitioner's claim of ineffective assistance of appellate counsel as raised in the instant action, this Court shall apply the Strickland two-pronged standard used for claims of ineffective assistance of trial counsel.  See United States v. Cook, 45 F.3d 388, 392 (10th Cir.1995).  The Strickland test requires a showing of both deficient performance by counsel and prejudice to Petitioner as a result of the deficient performance.  Strickland, 466 U.S. at 687. When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the Court first examines the merits of the omitted issue. Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999).  If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance. Id.; see also Parker v. Champion, 148 F.3d 1219, 1221 (10th Cir.1998) (citing Cook, 45 F.3d at 392-93). If the issue has merit, the Court then must determine whether appellate counsel's failure to raise the claim on direct appeal was deficient

and prejudicial.  Hawkins, 185 F.3d at 1152; see also Cook, 45 F.3d at 394.

In this case, after a careful review of the record in light of Petitioner's allegation of ineffective assistance of appellate counsel, this Court finds no basis for granting relief under §2254(d). Petitioner contends that his constitutional rights were violated because he was not properly bound over following the preliminary hearing. Specifically, he argues that he was never bound over on the felony murder charge, and that inadmissible evidence was used to bind him over on the malice aforethought murder charge. Insofar as Petitioner's challenge is based on procedural defects relating to the felony murder charge, the Court finds the claim moot as the OCCA found the felony murder conviction to be invalid. Richie, 908 P.2d at 275.  As for his second challenge to the preliminary hearing, the Court finds no constitutional violation arose in connection with Petitioner's pretrial proceedings.  The pretrial proceedings as a whole adequately informed Petitioner of the charges, witnesses, and evidence against him well before trial. His attack on the validity of the preliminary hearing became harmless error and unreviewable after the jury found him guilty after trial. See United States v. Mechanik, 475 U.S. 66, 73 (1986); United States v. Taylor, 798 F.2d 1337, 1339 (10th Cir. 1986). Appellate counsel was not constitutionally ineffective for failing to raise this claim on direct appeal.  Petitioner is not entitled to habeas corpus relief on this claim.

## XXI.   Competence of Petitioner (ground 21)

In his twenty-first ground for relief Petitioner asserts that he "is now or may become insane and ineligible for execution" (Dkt. # 6 at 144).  Mr. Richie raises this issue acknowledging that it is "not presently ripe for review."   Dkt. # 8 at 47. Ford v. Wainwright, 477 U.S. 399, 409-10 (1986), holds that the "Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." The determination of whether an inmate is competent to be executed,

however, cannot be made before the execution date is imminent, i.e., before the warrant of execution is issued by the state. See Herrera v. Collins, 506 U.S. 390, 406 (1993) (finding "the issue of sanity is properly considered in proximity to the execution."). Petitioner's execution date is not imminent. Thus, his competency claim is premature.

**XXII.  Evidentiary Hearing**

Petitioner's request for an evidentiary hearing has been addressed by previous order (Dkt. # 15).

**CONCLUSION**

The Court has determined that Petitioner's trial was tainted by Constitutional error. As more fully set out herein, the Court finds that Petitioner is entitled to habeas relief on his fifth and sixth grounds for relief. The Court further finds that all other requests for relief must be denied. Therefore, the Court orders that a writ of habeas corpus shall be issued unless, within 180 days from the date of this Order, the State of Oklahoma has commenced proceedings to retry Petitioner.

**IT IS SO ORDERED** this 21st day of May, 2008.

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

92